## CONRADER et al. v. JUDSON GOVERNOR CO.

(Circuit Court of Appeals, Second Circuit. December 1, 1916. On Motion for Reargument, December 19, 1916.)

No. 304.

1. PATENTS ⬦⟿328—VALIDITY AND INFRINGEMENT—PUMP GOVERNOR.
    The Conrader patents, No. 664,468, No. 687,449, and No. 1,072,576, each for a pump governor, the later two being for improvements on the device of the first patent, *held* valid but not infringed, and No. 810,109 *held* void in the present broad form of the claims because of resultant double patenting.

2. PATENTS ⬦⟿241—INFRINGEMENT—SIMILARITY OF RESULTS.
    A similarity of result does not show infringement, if that result is one old in the art and if the general mechanical method of producing the result is not that of an equivalent combination.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 380; Dec Dig. ⬦⟿241.]

---

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeals from the District Court of the United States for the Western District of New York.

Suit in equity by Rudolph Conrader and the Jarecki Manufacturing Company against the Judson Governor Company. From the decree, both parties appeal. Reversed in part, and affirmed in part.

Both plaintiffs and defendant have appealed from the decision of the District Court holding valid and infringed patents 664,468, 687,449 (except Claim 17), and 1,072,576, holding Claim 17 (supra) valid but not infringed, and holding patent 810,109 invalid. The opinion of the District Court will be found in 226 Fed. 207.

Hugh C. Lord, of Erie, Pa., for Jarecki Mfg. Co. and Rudolph Conrader.

C. Schuyler Davis, of Rochester, N. Y., for Judson Governor Co.

Before COXE and WARD, Circuit Judges, and CHATFIELD, District Judge.

CHATFIELD, District Judge. [1] This action was brought by Rudolph Conrader, the patentee, and the Jarecki Manufacturing Company, holding an exclusive license to five patents issued at various times to Conrader.

The earliest patent was issued December 25, 1900, No. 664,468, upon an application filed January 31, 1900.

The second patent was issued upon the 26th of November, 1901, under No. 687,449, upon an application filed September 10, 1900, which it will be noticed was prior to the date of allowance of the first patent.

A third patent was issued February 18, 1913, under No. 1,053,904, upon an application filed October 26, 1910. This third patent was withdrawn from the action at the time of trial.

Another patent to Conrader, issued November 2, 1904, under No. 775,391, on an application filed January 29, 1902, is set forth in the record and has been considered in the development of the art.

These patents are stated by the patentee to cover improvements in governors for pumping or compression engines.

The fourth patent in suit was issued on January 16, 1906, under No. 810,109, upon an application filed January 23, 1905. It shows a form of governor or regulator for a pumping engine to create a vacuum, that is, to pump from a receptacle, containing a medium at less than the atmospheric pressure into a space where the pressure is as much as that of the atmosphere. The District Court held this patent invalid for lack of invention.

A fifth patent was issued upon the 9th day of September, 1913, under No. 1,072,576, upon an application filed October 26, 1910. This patent claims certain improvements in controlling devices for compressors, by describing "a centrifugal governor with improvements within the governor itself, and controlling mechanism operating upon the relief device of the compressor, together with a pressure device acting upon the governor valve."

It will be pointed out later that employment of a relief device was the outstanding feature of this patent, but the general style of the

machine used by the patentee as an illustration, and the application of the ideas shown in his earlier patents to the form of machine described in this latest patent, must be carefully kept in mind in considering the present case. The District Court held this patent valid and infringed as to the claims included in the action, viz. 1, 2, 3, 4, 6, 12, 14, 15, and 16.

The District Court has found and the record shows that a governor for a pumping engine, in the sense of a device which will direct the operation of the pumping engine, so as to restore the desired pressure of the compressed vapor or fluid when this pressure is too greatly increased or reduced by use and withdrawal, was old in the art in mechanical combination with the ordinary centrifugal steam governor which, by the outward movement of the centrifugal balls, shuts off the motive fluid in case the speed of the engine, doing the pumping, becomes excessive.

It is evident that, if the amount of withdrawal was less than the supply compressed by the engine, the pressure would increase, would thereby increase the load or work of the engine piston at each stroke, and might stall the engine, even though the pressure did not reach a dangerous point in so doing. It was also well known that when starting up, that is, when pumping into an empty receiver, the pumping engine could run at its maximum speed without need of interference until the pressure in the compression receptacle had reached a point where the pumping should be checked.

As shown by the prior art, Conrader recognized the then evident proposition that the so-called centripetal force, which opposed the outward motion of the centrifugal balls, consisted of the weight, that is the force of gravity acting upon the mass of these balls, or of a spring, if the center of gravity was as high as the point of suspension and a contracting spring was present. He found in the prior art certain patents and forms of device in which regulation of the supply of motive fluid was accomplished by the operation of a lever which forcibly and directly closed the steam valve by acting upon the stem of the centrifugal governor without regard to the position of the centrifugal balls. Clayton, No. 315,244, April 7, 1885, and Gardner, No. 638,-412, December 5, 1899, were of this type. In another form of device the pressure governor, by a separate attachment apart from, and independent of, the speed governor, shut off the supply of motive fluid, as in Reynolds, No. 239,194, of March 22, 1881.

The usual method of accomplishing this result was the use of a weighted lever, which would be required to exert force enough to overcome the mass and velocity of the parts moved, or which would throw upon the engine and the speed governor the effect of stoppage of the engine by means as independent as would be the act of the engineer, if, in response to some signal, he should shut down the engine. The engine would not start itself after stopping and was apt to stop if the speed was slow and the load heavy.

Conrader sought to apply to a speed governor an indirect or automatic control, by which, whenever the pressure of the compressed vapor became too great, no matter what the cause, the centrifugal balls

of the speed governor would be caused to move out, thus closing down the stem of the steam valve, but which, when more compression or greater speed was needed, would raise the stem and set the engine at work.

In discussing these patents we will assume that steam is the motive power, and that the stem of the speed governor is maintained in a vertical position, until it is necessary to consider a different form of device.

Conrader employed a speed governor in which the center of gravity was as high as the plane of rotation of the balls of that governor, and inserted centripetal springs to take the place of gravity. It was still true that the outward movement of the centrifugal balls would cause a downward movement of the stem in shutting off the steam. Conrader reasoned that a weakening of the centripetal spring would cause the balls, under rotation at any given speed, to move further out and to, thus, shut off the steam. In place of the engineer whose mind should direct the shutting off of the steam, or in place of the lever which by overpowering force should overcome the resistance of the parts, when the pressure created by the work of the steam engine became too great, he caused this pressure to exert an influence against the centripetal springs. Thus weakened, these springs would allow the centrifugal balls to move outward, without any increase of speed, the steam would be shut off, and the work which the engine was doing thereby diminished and the pressure then relieved. If the pressure diminished, it would restore the tension of the centripetal spring, the stem would be raised, and the steam would again be supplied for work.

Conrader in his earliest patent, No. 664,468, describes his invention in Claim 1, as follows:

"In a pump governor, the combination of a centrifugal element; a centripetal element arranged to act in opposition to said centrifugal element; and means actuated by the pumped fluid for varying the relative strength of one of the elements within the limits of the power exerted by the other element."

It will be seen that he has indicated the possibility of varying the strength of the centrifugal element, within the limits of the power exerted by the centripetal element, if that seems advantageous; but, in the form used by him as an illustration and in all the devices which we have under discussion, it is more convenient to weaken the centripetal element, so long as we are concerned with the vertical stem carrying the centrifugal balls, or its equivalent.

It is evident that, so long as the centrifugal element shuts off the steam, by an outward movement, it is somewhat easier to lessen this movement, against the force of the engine, than it would be to increase the movement as the engine stops and to diminish it as the engine increases in speed.

The District Court has found this first patent valid, and Claims 1, 2, 3, 6, 9, 10, 11, 12, 13, and 14 sued upon infringed.

In order to avoid abrupt action and to regulate the effect upon the speed governor, in accordance with the need as the pressure gradually increased, Conrader employed what he calls a dash pot effect, by

diminishing the capacity of the port through which the compressed fluid passes when the valve in the compression chamber reaches the point where it is necessary to affect the work of the pumping engine. He distinguishes between the necessities of a single and double engine, in order to avoid the possibilities of stoppage, and states that by varying the strength of one of the elements within the limits of the power exerted by the other element, the governor "remains active as a governor throughout the operation of the engine. In some of the types heretofore used the force of one of the elements has been wholly neutralized by mechanism operating upon the other element with such power as to eliminate the centrifugal action of the governor from the valve entirely."

The capacities of the engine and of the compressor, as well as the expected demands of the work, establish a standard or mean rate of rotation of the centrifugal governor which will indicate the speed of the engine when pumping, so that the load and the demands upon the engine are taken care of and the pressure is kept relatively constant. If the engine is so adjusted that the various parts come to equilibrium and maintain this fairly constant pressure, then the rate of rotation of the speed governor is referred to by the various witnesses and patentees as the "normal speed" under those conditions. The parts when properly adjusted will tend to remain in equilibrium, and, the more constant the equilibrium is maintained, the more nearly will the "normal speed" be steady or constant. If the supply of steam is changed in accordance with the position of the centrifugal balls, and if this position is controlled by the so-called pressure governor, and if thereby the steam is shut off through an outward movement of the balls, it is apparent that as the pressure element allows the balls to move outward the speed of rotation would not be affected, but the supply of steam would be decreased, the speed of the engine would then decrease and the centrifugal balls would tend to draw in, unless the pressure continues to increase and, acting upon the centripetal springs, sends the balls further out, thus continuing to shut off the steam until the pressure decreases. When this pressure decreases, the steam valve is opened and the engine goes to work in the reverse manner.

But the term "normal speed" has been used to indicate also that rate at which the speed governor is rotating when it begins to close the steam valve after the pressure device has reduced the maximum rate of rotation which was reached when the engine was running light. If the engine was adjusted so as to unload during this period, the engine would still be running light, and the action of the centrifugal governor occurs at a time when the pressure device is not exerting an influence to shut off the steam through the action of the speed governor.

Thus Conrader, as found by the court below, had in mind (whether the engine was working or running light) the maintenance of a uniform pressure with as little variation as possible from the uniform standard of speed which would be obtained when the parts were in equilibrium and working steadily. But thus the pressure would

238 F.—23

be the constant aimed at, while the speed would, within certain limits, be rapidly changing and oscillating in order to keep the work done equal to the demand. The court below uses the term "normal speed" as if the function of a speed governor was the object of the invention and as if uniformity of rotation of the speed governor, rather than constant oscillation of the stem of the governor, were the norm to be obtained. In other words, the court below seems to have considered that the result of adjustments affecting the average speed shows the purpose of the invention rather than to have kept in mind the achievement of constant pressure with the required amount of work done (with variable speed and variable steam supply) as the object of the pressure governor.

Between January 31 and September 10, 1910, Conrader found that the complete change in centripetal force at each operation of the pressure piston, although gradual in effect, caused the steam engine to stall at low speeds, even when a flywheel was used, if the engine was of the single type. He also found that the increased resistance of the springs as they were compressed had the same effect, and, if anything happened to the belt of the steam governor, danger might arise from an increase of pressure when the means of shutting off the steam had been taken away. He therefore filed the application resulting in the second patent in suit.

This patent has been held valid and infringed as to Claims 1, 3, 8, 13, and 14. In the drawings and specifications it shows an improvement to the governor described in the first patent, by the addition of a nut, which, when used with a single engine, is so placed as to bring to rest that part of the frame extending the centripetal springs, before the piston of the pressure cylinder has entirely completed its action.

In this way Conrader applied the principles of the prior art in leaving the centrifugal governor in control of the valve at low speeds, and thus to avoid stalling or stoppage of the engine. This was covered by Claim 14 of this patent, and all machines put out by Conrader have contained this device.

In this patent, Conrader further planned an arrangement of levers which would give him the benefit of a varying arm and would apply a toggle mechanism in such a way as to furnish increased leverage substantially to the extent that the springs gave increased resistance as they were further compressed.

Conrader also included a claim (17) for the purpose of describing the device used by him to prevent excessive speed in case of accident to the belt causing rotation of the speed governor. As was held in the court below, this particular device, consisting of an idler pulley running at the end of a weighted arm, and maintained in such position as to cause the weight to entirely close the steam valve, if allowed to fall in case of accident, was shown in the prior art and there would seem to be no invention, in the basic or broad sense, in applying such a safety device to the governor in question.

The defendant seeks to show that this Claim 17 is entirely invalid as constituting a mere aggregation of parts instead of a patentable

combination. There seems to be no reason for disagreeing with the finding of the District Court in this respect, and inasmuch as the defendant's device is of an entirely different character, there seems to be no reason for holding it an infringement of the combination described by Conrader in Claim 17. In other words, Claim 17 must be limited to a structure substantially as described, if it be held that Conrader showed invention in making the necessary mechanical arrangements required to apply the principles of the prior art.

This brings us to the third Conrader patent, which was directed toward a means for regulating more closely the effect of a change of pressure in the receiver so as to accomplish a gradual reduction of, speed in the pump by "intensifying the change of fluid pressure on the motor over a change of pressure in the receiver."

As this patent has not been sued upon and is not infringed, no description of it is necessary other than to say that it shows, in 1902, the direction in which Conrader felt that improvement was needed, and also shows retention by Conrader at that time of the form of pressure or pump governor which had been set forth in his earlier patents.

In 1905, Conrader applied for his next patent in suit, which was to adapt his pressure governor to the needs of a pump creating a partial vacuum. Here, again, he followed the general style of the pressure governor, and directed his specifications and claims to the needs of a pump which should withdraw from a receptacle holding vapor at less than atmospheric pressure, a portion of that vapor into the outside atmosphere.

The court below has held the claims of this patent sued upon, 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, and 12, invalid for lack of invention. The broad language of his claims would give rise to a case of double patenting if these claims be held valid in addition to the same application of principles expressed in similar language in his first patent describing a pump governor and already held valid therein.

The general style of machine and application of ideas is, as was stated by the District Court, the same as in the former patents, and no inherent difference in principle can be observed in changing from a pump governor to a vacuum governor. As was said by the District Court, the pumping is, in each case, from the receptacle with lower pressure into a receptacle containing a medium with higher pressure. If the defendant be held as an infringer in this case, it must be as an infringer of the claims of the earlier Conrader patent, and Conrader should gain no advantage by repeating his earlier claims in connection with his combination to meet the needs of a vacuum governor. The finding that the broad claims of this patent are invalid will be sustained.

The fifth Conrader patent brings in a new feature, generally known as an unloader, and describes this in use with a type of governor resembling the defendant's structure rather than that of the earlier Conrader patents. It therefore will be advantageous to consider at this time the defendant's device and to state the elements which must be considered in deciding the issue as to infringement.

According to the testimony, the defendant's assignor, Osborne, who had been employed in the plaintiff's factory under Mr. Conrader, and who had been familiar with the construction and assembling of the Conrader governors, left that employment and shortly thereafter proceeded to construct a type of governor which the defendant has placed upon the market and which is involved in this action. He took out three patents, two of which are contained in the record below, and which show the type of governor as to which infringement is charged. The earliest of these three patents was issued July 12, 1910, under No. 963,803, upon an application filed March 5, 1910, and hence was actually available to Conrader at the time of filing the application for the fifth patent in suit.

The second Osborne patent was issued February 17, 1914, No. 1,-087,818, and the last Osborne patent was issued April 20, 1915, No. 1,136,607, upon an application filed May 29, 1913. This last Osborne patent is apparently in exact conformity to the device used as an exhibit in this case and which it is claimed infringes the Conrader patents.

But in all three of the Osborne devices we find a pressure governor in which a horizontal stem is used to carry a circular ring (instead of the centrifugal balls of the earlier Conrader governor), and in which a circular spring surrounding the stem and resting upon a fixed abutment furnishes a centripetal force. We find also a rotary steam valve operated by the turning of the stem, rather than by its longitudinal movement, and another spring resisting the rotation of this stem, and hence tending to open the steam valve whenever it is closed. This stem is in turn rotated by the movement of a sleeve which is shifted in the direction to close the steam valve by the opening of the centrifugal ring corresponding to the moving out of the centrifugal balls and which is returned by the force of that spring which also opens the steam valve.

It is not necessary to go into the details of the two earlier patents as the form of the defendant's device is shown by the exhibits and is described in the third patent as to the particular features with which we are concerned, viz. the levers and springs by which the force of the pressure piston and of an unloader device is communicated to the rotary steam valve.

Conrader in his fifth patent applies his unloader device to a governor similar in general style to this Osborne form of governor, and, in considering the defendant's structure from the standpoint of infringement, we must take into account the application of an unloader device to either type of governor. In patent No. 687,449, at line 55, p. 1, Conrader says:

"This feature of the invention is applicable, however, not only to a governor having the varying centripetal element within the limits of the power exerted by the contripetal element, but is also applicable to that class of governors in which the governor valve is directly actuated by the pressure device."

Although not speaking of the unloader in the lines quoted, the application of the language is exactly analogous.

The general purpose of an unloader device was well known in the

prior art, and certain patents such as Prellwitz, No. 689,565, apply this idea, which had been worked out for application to other mechanism, to a compressor governor. The purpose of the unloader device is to save work by the pumping engine, when the pressure in the cylinder reaches a predetermined maximum, and when there is not demand enough upon the compressed vapor to keep the pressure from increasing. The unloading device then allows the engine to run without undergoing the work of further compression or, in that sense, to run light. It is not necessary to speak of this unloader in its ordinary capacity as a safety valve, as any device which will cause relief to the pressure of the compressed fluid, when it reaches a certain maximum, would furnish a safety valve action. But when the object desired is to stop further compression as well, and to leave the engine in such condition that it may not be stalled, and may be started up automatically by the action of the pressure governor, it is apparent that a mechanism would be required which would involve invention if presented in any new form.

As has been said, Prellwitz described an unloader for this purpose, and his patent was issued on December 24, 1901. On February 19, 1907, a patent was issued to one Hill, No. 844,801, which also involved the element of an unloader, and it can be seen from this that the mere idea of the unloader was not of itself new, as applied to air compressors, when Conrader filed the application for his fifth patent, in 1910.

It must further be borne in mind that the physical device embodying plaintiff's patents, used as an exhibit by the District Court upon the trial, did not conform to the particular style of governor described in Conrader's patent, No. 1,072,576, but on the contrary applied the unloader described in that patent to the governors shown in the drawings and specifications of the four earlier patents.

It must also be borne in mind that in order to avoid the possibility of double patenting, we can look only to the first Conrader patent, No. 664,468, for the broad basic claims covering the Conrader idea or method of indirect control of the steam valve, through action upon one of the elements of the speed governor.

The Osborne patents, beginning in July, 1910, developed the ideas which resulted in the particular form of unloader shown in the device as to which infringement is charged. Osborne's patent, No. 1,136,-607, was issued on April 20, 1915, after the trial of this suit was had. Both sides have referred to this patent in this court and treated it as a matter of public record. A copy is presented with the briefs, and therefore it has been substantially included in the record in this court, although it adds nothing in particular to the evidence presented by the defendant's machine which was before the District Court.

The District Court says, with reference to the unloader device, that:

"It was not a new expedient to use a relief device in connection with a pressure device, * * * but there is no disclosure of an unloader device in connection with the speed controlling instrumentality to perform the function of the patent in suit, that is, the prior art discloses no centrifugal governor in which the variation of the speed of the engine is the controlling feature. Hence, in my estimation the Conrader adaptation of a speed controlling

mechanism in connection with a control motor or pressure device to control the relieved mechanism on compressors of the type in question was new and novel."

The court based its opinion upon the fact that "the centrifugal mechanism and the relief mechanism are so correlated as to produce practically simultaneous operation," and, also, that the "unloading apparatus which operated to achieve the same result, was an infringement of complainant's."

The testimony relating to the operation of these unloader devices took up a considerable portion of the record. The defendant's expert apparently failed to take into account one express purpose of operation in the defendant's mechanism. After the unloader device has opened the piston valve and lightened the load of the engine, as well as gradually reduced the pressure in the cylinder, the speed governor will still operate to further close or completely shut off the steam, if the speed of the engine shall increase beyond the danger point. The mechanism of the defendant's device is so constructed that the steam valve will not be entirely closed (through the operation of the pressure governor or of the unloader device) in order that a stalling of the engine may not result. When we consider the defendant's unloader and the plaintiff's unloader, it is apparent that they produce the same result, that is, they each lighten the load upon the engine, gradually lessen the pressure in the condenser, and are actuated or set in motion by movements of the mechanism which is operated by the pressure piston in carrying out the work of the pressure governor, whatever that may be. But the devices are not similar in the construction and arrangement of the parts. They resemble each other only in the sense that each one opens one of the valve ports to the compressor, and that each one serves the same general purpose.

[2] Leaving out of consideration the original Conrader invention, it is impossible to agree with the conclusion of the District Court that, because the same result is achieved, the claims of the Conrader patent, No. 1,072,576, are infringed, and that these claims do not require a strict construction. The case of Westinghouse Air Brake Co. v. New York Air Brake Co., 119 Fed. 874, 56 C. C. A. 404, holds that a similarity of result does not show infringement, if that result is one old in the art and if the general mechanical method of producing the result is not an equivalent combination.

Claim 1 of the Conrader patent, No. 1,072,576, is as follows:

"In a controlling device for compressors, the combination of a speed controlling device, controlling the motive fluid; a relief device for the compressor; a fluid actuated controlling motor acting on said controlling device; a fluid actuated relief motor acting on the relief device; and means actuated by the controlling motor for controlling the relief motor."

This court differs with the conclusion of the District Court that the unloader patent shows an improvement over the prior art broadly patenting to Conrader the application of "a fluid actuated relief motor acting on the relief device."

The Conrader patent is valid in so far as it describes as novel the mere use of a "means actuated by the controlling motor for controlling the relief motor." But this claim, in order to be valid, depends upon

the old idea of the earliest Conrader patent and upon the general style of control, using the relief motor only in combination with the other elements. of the Conrader device, and this the defendant's device does not infringe, except as we consider the general proposition involved in the earlier patents.

In other words, the Conrader patents are valid as combinations and improvements, dependent upon the idea taught in the Conrader patent, No. 664,468, and almost immediately modified by the Conrader patent, No. 687,449; and, if the defendant's device infringes, it infringes only those two earlier Conrader patents which cover the general principle of the Conrader idea. It would allow double patenting to hold infringement of the last Conrader patent, No. 1,072,576, when the question at issue is the method of control by the pressure device rather than the particular application of a relief motor in connection with that control. But consideration of the testimony and of the exhibits has been greatly complicated by the use of a relief motor with the defendant's structure, and of the particular parts introduced in connection with that relief motor which enter into any operation of the machine.

The evidence finally reached a point of accord upon the proposition that in the defendant's structure, with the relief motor present, the two screws (labeled on the illustrated drawing of the defendant's device as 78 and 80, which screws were interposed because of the relief mechanism, and which are to effect a positioning of the various levers transmitting the motion under pressure from the relief motor to the rotary steam valve) may be so set as to increase or diminish the amount of rotation which will be produced by the opening of the steam valve, not closed through the relief mechanism or the various parts of the pressure governor, and with the result that the ring (that is, the balls of the speed governor) will begin to open and to complete the shutting off of the steam at a lower rate of rotation.

The experts and the parties to the case finally also reached an agreement in the court below upon the proposition that the speed governor and the pressure governor acted conjointly, so far as physical movement of the parts was concerned, when the position of the steam valve was maintained at any point where the revolution of the speed governor did not exceed the amount of rotation which has just been stated. This amount of rotation would represent the maximum speed of the engine under so-called conjoint control; that is, the maximum speed of rotation before the centrifugal or speed governor took control. It represents the minimum rate of rotation at which the speed governor takes control. This rate of rotation represents, of course, an equilibrium between the parts of the machine resulting from the machine's operation. This rate is ascertainable and would be "normal speed" of the speed governor under those conditions. But this normal rate of speed would immediately change upon any change in the adjustment, either through the operation of the screw 80 or by other conditions which do not concern our discussion of this question.

Much stress was laid in the court below and in the argument upon the appeal, on this sort of deviation of this so-called "normal speed." The parties do not seem to be at variance in describing the condition

to which the words ."normal speed" are attached by Conrader, and Osborne in his patents seems to recognize the use of the term. But determination of the issue does not follow from clearing up the dispute as to the use of the words "normal speed."

The screw 78 is used by the defendant in setting the position of the parts operated in connection with the relief device, and would act as a block if allowed to remain in the extreme position to which it had been advanced. The screw 80, whether the unloader device is or is not present, moves a rocking lever which rotates a so-called "floating lever" and changes its position so as to partially close the steam valve, thus diminishing the working force, and, without reference to the pressure produced, necessarily reduces the speed of rotation which when working the engine would reach.

It is evident that if at this reduced speed the force of the spring forming the centripetal member of the speed governor is not strong enough to prevent any outward motion of the centrifugal ring, then the speed governor would go in and shut steam off further at the lower speed which would be attained by the engine when pumping under the decreased head of steam which would be furnished by the arrangement of the parts with the screw 80 set as just stated.

There is nothing in the record to indicate the minimum speed at which the centrifugal ring would start to move, if it met with no resistance through other parts of the speed governor and its connections. But it seems to be necessary to *assume* that the strength of the so-called centripetal spring (42) is not sufficient alone to restrain the ring of the speed governor, when rotating at the lowest speed which is shown as a result of the operation of the screw 80 in the defendant's structure; and that the higher speeds at which the operation of this ring begins (when the screw 80 and the unloader have not prevented) would be due to the position and resistance of the sleeve and of the various parts of the valve closing apparatus, including the spring which acts to open the steam valve, as soon as the obstructing pressure, whatever that may be, is released.

We approach at this point apparently the real issue in the case. In the defendant's structure, the arrangement and proportion of the parts is such that adjustment will allow the steam valve to stand partly open unless the centrifugal speed governor closes the valve because the steam engine is running at a dangerously high rate. This steam valve would again open as soon as the dangerous rate is reduced. But so far as the pressure governor is concerned, it ceases to operate beyond the fixed point desired, when the engine is running light, or until the pressure increases so that the amount of pumping should be diminished. With the unloader device present, the two then furnish a constant protection against undue pressure and undue speed in the defendant's machine.

In Conrader we have presented in the second patent, No. 687,449, the block H-2, which interrupts the further operation of the pressure regulator, and when an unloader is present we have the same situation, viz. that undue pressure is relieved by the unloader, and that excessive pressure below the point of unloading will diminish the supply of steam, by operating the speed governor so as to shut off the steam,

while the block *H-2* prevents the pressure governor from completely closing the steam valve and stopping all action of the centrifugal governor. Thus the engine may still run at low speed and not become stalled.

But in Conrader, the centrifugal governor ring moves out as the steam is shut off. The shutting off of the steam is produced indirectly by affecting the operation of the speed governor. The rate of rotation of the speed governor at which the centrifugal ring will begin to move the steam valve, independent of the operation of the pressure governor device, is fixed, but the rate of rotation which will close the steam valve, under the combined action of the pressure governor with the rotation of the speed governor, is lower, up to the point where the block *H-2* cuts out the pressure governor. Hence, in Conrader, the pressure governor and the speed governor are acting conjointly, in the sense that the speed governor is fixing the actual amount by which the steam valve is closed, under the direction of the pressure governor, during the period in which the pressure governor is acting upon one element of the speed governor, viz. the centripetal spring.

In the defendant's device there is conjoint movement of the speed and pressure device, only when the speed and position of the centrifugal governor is changed so as to reach an equilibrium with that arrangement of parts which the pressure governor has directly established, or when the speed governor reaches a rate of rotation which the pressure governor and the unloader cannot change. But this is not within the broad claims of the Conrader patents. In the defendant's structure, the pressure governor and the unloader influence the rotation of the speed governor by physical movement of the parts closing the steam valve, including the spring which tends to open the steam valve independently of the centrifugal governor. But in so doing it increases the compression of this spring (*56*) which the plaintiff insists is a part of the centripetal element. It allows the ring of the centrifugal governor to close in and thus prepares the speed governor for action, but the ring must open again so as to move the sleeve into contact with the levers before it can affect the steam supply. Hence, while the pressure device closes the ring, as the steam is shut off, it also so arranges the parts that the ring must open again to complete the shutting off of the steam. From this the plaintiffs contend that the centripetal force has been weakened and that the ring can move further out, that is, shut off the steam, at a lower rate of rotation than if the pressure device had not acted. But this is not done by weakening the centripetal force or by producing the result through action upon the speed governor. It is accomplished by a physical removal of the parts, through direct closing of the steam valve, and through the establishment of new conditions under which the speed governor may go to work after its period of inactivity. Such a result does not accord with the claims of any of the Conrader patents, and is not caused by the mechanical equivalent of any of his patented devices.

Claim 1 of the earliest patent states in the broadest form the general proposition upon which a pioneer patent is claimed. But in this claim the statement that the "centripetal element is arranged to act in opposition to said centrifugal element" is true with respect to any governor.

The statement, "means actuated by the pumped fluid for varying the relative strength of one of the elements within the limits of the power exerted by the other element," cannot be construed to cover a mechanical arrangement in which some of the parts which would ordinarily enter into the force of the centripetal element are, for a time, moved to a position where they do not affect the centrifugal element in its control of the steam valve. As has been said, it is true that in the defendant's structure, when the centrifugal or speed governor is used purely as a safety governor against excessive speed, the pressure governor and the unloader have already operated and removed from the sphere of action some of the parts, including the spring 56, which previously retarded the operation of the centrifugal or speed governor.

But the purpose of the Conrader invention and its improvement over the prior art was not in the direction of confining the centrifugal or speed governor to one particular function. With the meaning just stated, Claim 1 above quoted could be applied to a speed governor in its operations at such time as it was not within the control of the pressure governor, and when it was acting in spite of the pressure governor, solely for one limited purpose.

The testimony in the case, the observations of the witnesses based upon variations of speed at which the centrifugal or speed governor began to complete the closing of the steam valve, and the position of the various parts up to that point, as well as thereafter, have caused much discussion. It is admitted by the plaintiff that in Conrader the balls of the centrifugal governor go out as the pressure governor goes into operation, and continue to go out until the pressure governor lets go. During this time the stem moves down. In the defendant's structure, the ring which rotates the centrifugal balls closes or comes in as the pressure governor goes into operation, and the sleeve (or part corresponding to the stem) moves up (that is away from the steam valve). It is evident that the spring 56 offers slightly greater (and not less) resistance when the pressure governor is operating, than when it is not. But it is contended by the plaintiffs that these changes are not the natural consequence of pressure exerted to produce a direct closing of the steam valve. They assert, on the contrary, that the action of the pressure governor so disturbs the equilibrium of the parts that the centripetal element of the speed governor changes more rapidly than the centrifugal element, and that the centrifugal element does not follow, but is still in control.

This contention brings into the so-called centripetal element the various arms and sleeves by which the steam valve is closed, and also the spring 56, which tends to keep the steam valve open. But assuming that these parts do enter into the general resisting force of the centripetal element, it has been seen that the spring 56, even if acted upon by the pressure governor, has no force exerted in such a way as to put the centrifugal governor in operation, until the pressure governor ceases to produce the necessary result. The various parts are moved directly by the pressure governor, according to the methods of the patents of the prior art, until the point is reached where the pressure governor goes out or remains stationary and where the speed governor again takes control.

Under these circumstances, we are unable to hold, with the District Court, that the broad claims of the Conrader patents are basic or pioneer claims, covering all changes in controlling the steam valve, through the operation of certain parts of the device which have some effect in fixing the position of the parts moved by the centrifugal governor, when it acts. If these claims be not given that broad basic interpretation, or if their broad language be applied to something other than the basic principle shown in the Conrader method of operation, then the defendant's structure does not infringe. The addition of a safety device, as described in Claim 17 of patent No. 687,449, and the addition of the block H-2 does not affect this issue of infringement. Even if the Conrader claims describing these structures be held valid as a patentable combination, it would not prevent the use of the defendant's device if it does not infringe the broad idea of the Conrader claims.

There is but one proposition further which is brought in by the claims of Conrader patent, No. 687,449, providing for the use of lever arms of varying length to meet the change in pressure exerted by the various springs as they are contracted and expanded. These claims, again, appear to be valid in the sense that they show the application of a well known principle to the necessities of the Conrader device and present a patentable combination which is basic or general in scope only in so far as it involves the idea presented in Claim 1 of the first patent. In this sense the defendant cannot be held as an infringer. But it must be added that the defendant's structure does not show lever arms of varying length, in the sense in which those terms are used by Conrader. The defendant makes use of changes of position and the rotation of levers and rock shafts with shifting fulcrum points, thus producing different angles to correspond with the change in position, as well as strength, of the springs, but he does not accomplish the result by varying the leverage length of the arms themselves.

Some dispute arose in the case as to the intentions of Osborne in seeking to improve upon the Conrader structure. His statement that in the Conrader machine there was constant oscillation, with wear to the machine, and that he planned to remove the centrifugal governor from control during low speeds, seems to have been inaccurate since Conrader's earliest machines (under Claim 14 of patent No. 687,449) had means for effecting that desired result. But the motives actuating Osborne do not now enter into the issue, nor is this court concerned with the relative advantages of one structure or the other.

The defendant has questioned certain statements by the court below with respect to the operation of the defendant's device and of machines of this nature in general. Inasmuch as it seems to this court that the District Court failed to view the patents from the standpoint of the earliest disclosure, and to separate the basic idea of Conrader from the resultant composite device (which included the ideas of the later Conrader patents), and has found infringement in defendant's machine because of likeness in the result reached without reference to the precise means by which that result is obtained, it is unnecessary to follow further the discussion between the witnesses as to those matters. This

court has already set forth the issues so far as seems advisable, and stated the conclusions according to which decision is rendered.

The various claims sued upon in patents Nos. 664,468, 687,449, and 1,072,576 are held valid, and the decrees of the District Court affirmed in that regard.

The claims of patent No. 810,109 are held invalid in their present broad form, because of the resultant double patenting; but not for lack of patentable invention in the combination described. With this modification, the decree of the District Court is affirmed as to that patent.

The defendant's structure is held to infringe none of the claims of the Conrader patents in suit, and in this respect the decree of the District Court is reversed, except as to Claim 17 of patent No. 687,449, which was held not infringed in the court below.

As the case has been heard on cross-appeals, in which each party has secured some modification, no costs in this court will be allowed.

### On Motion for Reargument.

PER CURIAM. The plaintiff-respondent has applied for reargument as to the earlier Conrader patents because of supposed failure of this court to understand correctly the use and application of the block H-2, as set forth in Claims 13 and 14 of patent No. 687,449. This is predicated upon the statement in the opinion that, when the extension of the centripetal spring brings the parts into contact with the block H-2, the pressure governor ceases to act and the centrifugal or speed governor remains in control at low speeds. This court thus evidently used language, in referring to the block H-2, which was not in accord with the facts. The speed governor goes out of control when the block H-2, is reached and the pressure governor remains in action at low speed until the block c5 stops the operation of either governor. But no invention was involved in that application except as the stop was used in making practical the indirect method of control patented generally by Conrader in patent No. 664,468 as well as in No. 687,449. The defendant's governor operates upon a different theory and the correction of statement in the opinion would not affect the result.

Nor does the suggestion that, in the defendant's commercial structure, the sleeve is at all times connected positively with the levers closing the steam valve, make a reargument necessary. If the exhibits used were not correct, it might change the description of the device and of some of its movements, but the application of principle would be the same. Conjoint action is not the sole test of control by one element as affected by modification of the strength of the other element within the limits of the first.

Reargument is also asked because this court referred to the unloader of patent No. 1,072,576 (shown in the drawings in connection with a governor of the Osborne style) as if applied to the pressure governor of the Conrader type offered as exhibits under the earlier patents. The patentability of an unloader in combination was limited to the novel features in its result and in its arrangement of parts. This did not mean parts of the unloader, but those parts adapting or applying the unloader to the operations of the pressure governor and particularly a pressure governor employing the Conrader method of control in so far

as Conrader was inventing a combination of the unloader with his previous disclosures. If the Conrader patents covered the defendant's pressure governor, then the unloader patent would cover the defendant's unloader. The Conrader unloader patent is valid as a combination of an unloader with the indirect Conrader system of control, but it does not patent the old and unpatentable idea of applying an unloader to any pressure governor, upon the theory that the result is the same. The opinion did not exclude the device shown in the drawings of patent No. 1,072,576 but treated the claims as limited to that which Conrader showed by the drawings and specification, viz. an unloader applied to a governor of any style or type, which operated with Conrader's indirect method of control of the steam valve by the governor.

Motion for reargument is denied.

