PITTSBURGH IRON & STEEL FOUNDRIES CO. v. SEAMAN-SLEETH CO.

(Circuit Court of Appeals, Third Circuit. December 14, 1917. On Petition for Rehearing, January 29, 1918.)

No. 2228.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—ALLOY OF IRON.

The Speer and Forster patent, No. 1,071,364, claim 1, for an alloy of iron named "Adamite," covers a new article of manufacture, different from, but having characteristics of, both cast iron and steel. Such claim was not anticipated, is not invalid for insufficiency of description, and discloses novelty and patentable invention; the product being extremely valuable for the manufacture of rolls. Evidence considered, however, and *held* insufficient to establish infringement, but to show that defendant's product, while having an approximate similarity of analysis and performance, possesses physical characteristics which distinguish it from Adamite, and in fact is not Adamite.

2. WORDS AND PHRASES—"COMBINED CARBON."

The term "combined carbon," as used in the metallurgy of iron and steel, means carbon in union with some one or more metallic constituents in the iron alloy.

Buffington, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the Pittsburgh Iron & Steel Foundries Company against the Seaman-Sleeth Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 236 Fed. 756.

Frederick W. Winter, of Pittsburgh, Pa. (Frederick P. Fish, of Boston, Mass., of counsel), and Thomas Patterson, H. V. Blaxter, and F. N. Barber, all of Pittsburgh, Pa., for appellant.

Charles M. Clarke, of Pittsburgh, Pa. (James I. Kay, of Pittsburgh, Pa., Francis T. Chambers, of Philadelphia, Pa., and Ralph C. Powell, of Pittsburgh, Pa., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The bill charges infringement of Letters Patent No. 1,071,364, issued August 26, 1913, to James Ramsey Speer and William L. Forster, assignors of the plaintiff, for "Alloy of Iron." The defenses are invalidity and non-infringement. The District Court found for the defendant on both issues and dismissed the bill. 236 Fed. 756. The plaintiff took this appeal.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
248 F.—45

[1] The case has to do with an alloy of iron, which, in addition to iron, contains seven ingredients in small and varying proportions. They are carbon, silicon, chromium, nickel, phosphorus, manganese and sulfur. All these ingredients are found both in the product manufactured by the plaintiff under the patent and described to the trade as "Adamite" and in the alleged infringing product of the defendant made and marketed under the name of "Phœnix Metal."

The patent contains two claims, the second prescribing ingredients in precise proportions, the first, in proportions within given ranges. The first claim only is in issue. The patentees say:

"We claim—1. *As a new article of manufacture,* an alloy comprising *essentially* silicon .10% to 2.00%; chromium .5% to 1.50%; nickel .25% to 1.00%; sulfur, *not exceeding* .05%; phosphorus, not exceeding .12%; manganese, not exceeding .45%; *total* carbon 1.25% to 3.50%; and iron approximately sufficient to complete the 100%."

Alloys containing the ingredients of the claim appeared in the manufacture of iron and steel long before the patent. These several ingredients were known to possess definite characteristics or properties, which, when brought together in alloy, bore upon one another and upon the ultimate product in well defined ways. The patentees discovered no new chemical properties or functions in them. Variations in their proportions produced variations in their chemical effect upon one another, and in the chemical and physical characteristics of the product. Thus when a given property, as hardness, toughness, strength, was desired, the founder obtained it by employing in alloy the particular ingredients which the metallurgist had taught him would produce that property and by pursuing methods of heating which he had largely taught himself. The learning of the metallurgical engineer and the skill of the founder, though separate and distinct, were inseparably combined in producing the result.

Men of these classes in vast numbers had been working together many years before the patent, and by thousands of tests and experiments and by manifold achievements, had made the metallurgy of iron and steel a broad and highly developed field. A claim to monopoly of any part of that field by one entering it at this late day can be sustained only by clear proof of discovery of something there not before found, of an invention of something not before there. Such is the claim of the patentees.

The thing which the patentees claim to have invented is an alloy, which is "a new article of manufacture"—in a sense, a new metal. Its base is iron, but the metal is neither cast iron nor steel, though possessing characteristics of both. It resembles cast iron in its lack of the quality of elongation, in its resistance to abrasion and in its high carbon content; it resembles steel in its tensile strength, toughness, capacity to be worked or forged, and in the form of its carbon content. It is claimed that it bridges the gap between irons and steels —having chemical characteristics more nearly approaching the former, with physical properties equal to if not excelling the highest grades of the latter. It has been termed a metallurgical paradox. The name given it is—"Adamite."

The validity of the patent depends upon the ability of the plaintiff to establish two facts: First, that Adamite is a new metal; and, second, that the formula of the claim will produce it. The first is the basic fact, for the formula of the claim, both as to ingredients and proportions, is not altogether new. When we speak of Adamite as a new metal, we mean new in the sense of being different from, not merely a variation of, an old metal, as steel differs from cast iron.

We shall not discuss in this opinion the highly technical subject-matter of the patent the full significance of which is difficult to grasp without elaborate presentation, but shall content ourselves with a statement of the conclusions upon which, after close study, we base our decision.

[2] The striking thing or central characteristic in the chemistry of the patent alloy is its carbon content, both as to quantity and form. In quantity it lies well within the range of cast iron, but in form, it is that of steel. Its form is mainly combined carbon. That term, as used in the metallurgy of iron and steel, means carbon in union with some one or more metallic constituents in the iron alloy, for instance, iron carbide or the double carbide of iron and chromium. The method of obtaining very high carbon in combined form, by the given proportions of carbon combining and metal hardening ingredients of the patent alloy, in conjunction with the skill of the founder, is a matter of less concern just here than the fact that in the alloy of the patent, high carbon combined is chemically obtained, and that it contributes to and in a measure produces characteristics not before shown in any metal.

Aside from the chemistry of its composition, Adamite has characteristics of structure and performance which distinguish it scientifically and commercially from other metals. It has the quality of intense hardness and toughness (steel characteristics) coupled with an extraordinary ability to withstand abrasion, especially under heat (cast-iron characteristic). These are procured without the use of the expensive ingredients, chromium and nickel, in large quantities, by depending primarily upon high carbon, the cheapest hardening element—and using it in excess of what was considered permissible in a product having steel characteristics. Its tensile strength is more than twice that of ordinary soft steel. While possessing the stiffness of cast iron with its casting characteristic, it has the hardness and toughness of steel with the ability to be forged, rolled and worked like steel.

It is testified that when made into rolls it does from two to four times the work of other rolls in use when it came on the market and lasts from two to four times as long, thereby increasing output and decreasing cost of production and operation.

The fact that Adamite possesses these qualities and that they are qualities of merit, is evidenced by the tribute paid by the art in very substantial royalties and in a steadily increasing consumption at prices markedly higher than those asked for rolls of other metals.

While the defendant has met the case with much evidence that the art contained a vast number of alloys of varying degrees of hardness, toughness and strength, produced by the energetic agents of carbon,

chromium and nickel free from patent restraint, it has not shown that these characteristics or properties existed in the measure, in the combination, and in the peculiar relation in which they are found in Adamite. It has not shown that Adamite does not possess the characteristics claimed for it, or that any product possessed them before. In fact, there is evidence in abundance that there is such a product as Adamite; there is no evidence that there is no such product.

The alloy being novel, the next question is whether it was the result of an inventive conception. It was manifestly not an obvious combination. While its proportions were reached after many experiments, they were the result to which the experiments were directed. Somewhere in their progress lay a conception of the thing achieved. If the thing is otherwise a patentable invention it does not fail for lack of a definite point at which the conception appeared.

Aside from the question of patentable invention, the validity of the patent is challenged on the ground that its disclosure is insufficient. In this we find for the patent. The charge of insufficiency of disclosure is based doubtless upon the lack of disclosed mechanical detail, made necessary by the fact that the skill of the founder in pursuing foundry practice is called upon to supplement the metallurgical disclosure of the patent. It is impossible to disclose in a patent the founder's peculiar skill, and being no part of the invention, it is not required to be made a part of the patent disclosure.

That the disclosure is sufficient when read by one skilled in the art, is evidenced by the fact that when followed with skill, the product of the patent is obtained. When followed by one unskilled or when something else is obtained, the validity of the patent ceases to be a matter of concern.

The remaining question as to the patent's validity is whether the disclosed invention had been anticipated by alloys of the same formula in the prior art.

The defendant found in the prior art and produced in evidence formulæ and analyses of many iron and steel products, which were either within the analysis of the patent alloy or as close to it as is the analysis of the product of the defendant upon which the plaintiff bases its charge of infringement. These analyses appeared in patents, publications, and in the records of steel manufacturers kept in the regular course of their business. They are Hadfield Patents, Nos. 732,365 and 735,666; the Borchers Article; the Totten Patents, No. 872,483; 878,691; 947,263; Isaac G. Johnson Co.; Crucible Steel Co.; use of Mayari ore by Carpenter Steel Co., Maryland Steel Co., Reading Iron Co., and the defendant.

To the voluminous evidence upon the defense of anticipation we have given careful study. We find it unnecessary to discuss the evidence in this opinion for the reason that all of it is fatally deficient in one essential, namely, in failing to show that the products of the several prior art analyses were Adamite.

While showing products of varying characteristics and recording faithfully the progress of the art of steel making, the alleged anticipating alloys nowhere showed or even suggested when made or pub-

lished that they were Adamite or were metals which possessed in structure or performance the Adamite characteristics of cast iron and steel, or suggested to the art either the existence of such a metal or how to make it. If any one of the alleged anticipating alloys was Adamite, that fact, so far as the record shows, was not known to those who produced it or used it, and not being recognized as a new product with its distinctive characteristics, its production was purely an accident without profit to the art and without value as an anticipation. We are satisfied, therefore, that Adamite has not been anticipated by alloys, which, while accidentally of the same analyses, were not shown to be the "article of manufacture" of the patent.

We are of opinion that Adamite is what it is said to be, namely, "a new article of manufacture," different from but similar to both cast iron and steel, that its production involves invention, and that claim 1 of the patent is valid.

We now approach the question of infringement. The patentees admit that as metallurgy is not an exact science, any use of the patent formula within the wide range of each element will not necessarily produce Adamite (otherwise they are forced to admit anticipation), and that Adamite is produced only when one skilled in the art follows the formula with a proper regard to the correlation of its several elements. This being admitted, then certainly a person may pursue the formula and not get Adamite. Then he does not infringe. Or he may pursue the formula and get Adamite. Then he does infringe. The principal question upon the issue of infringement, therefore, is, not whether the defendant's product was of the analysis of the patent, but whether the defendant's product was the product of the patent, namely Adamite. This being the question, it may be inquired into along three lines:

1. Whether the formula of the defendant's alleged infringing alloy was the patent formula;

2. Whether it was outside the patent formula because of its higher percentage of sulfur; and

3. Whether the product of the defendant, either within or without the formula of the patent, was Adamite.

The analyses of the defendant's metal, offered as evidence of infringement, were not literally within the formula of the patent. They were within the formula as to percentages of all ingredients except that of sulfur. As to percentages of that ingredient they were uniformly and radically higher. The defendant maintains that this difference saves it from infringement; the plaintiff charges that the defendant used an excess of sulfur as a supplement to a low percentage of chromium (though such low percentage was within the chromium proportion of the patent); that this sulfur excess was the equivalent of any deficiency in the chromium of the patent alloy, and constituted infringement. Upon this point there was sharp controversy among the experts. But whatever may be the solution of this metallurgical question, the thing which we want to know is—what did the defendant get from what it used. If it got Adamite, then we must decide the question of equivalents in order to determine whether it got

it in the way the patent taught. If it did not get Adamite, it is immaterial whether an excess of sulfur was or was not an equivalent of any part of the patent percentage of chromium, for then it did not infringe.

The parties to this litigation are rival manufacturers of rolls. The essentials of a good roll sought by all roll manufacturers are hardness, resistance to abrasion, strength to withstand prodigious strains, and durability. Each had striven independently and in its own way to make improvements in these qualities. Each had succeeded. They had worked, as it now appears, on diametrically opposite lines. The plaintiff, through the patentees, employed chromium and chromium alone as an element to overcome the natural inclination of carbon to crystallize and to fix and hold it in combined form (omitting for the moment the influence of the element of silicon). The patentees did not employ sulfur for that purpose. They defined in their patent what elements were "essential" to produce that chemical result. Sulfur was not one of them. In fact they considered sulfur an impurity and repudiated it as an element or chemical to produce any desired result. They recognized it as a necessary evil and arranged to overcome it. They dealt with sulfur in iron because it was there and because it was impossible to eliminate it economically. They regarded it as a nuisance and an element not to be *used* but to be gotten rid of so far as could be done. Therefore, in their formula, the patentees placed sulfur at a low maximum (.05%), and called for its reduction to almost the vanishing point.

In making its rolls, the defendant pursued just the opposite practice. It recognized a merit in sulfur. It considered that (in its business at least) the merit of sulfur offset its objectionable quality and proceeded to make use of it. It did not reduce the normal sulfur content of its raw material, but, long before the patent (March, 1911), it actually increased sulfur above the normal content of the ore by deliberately adding iron pyrites to its alloy. It used a percentage of sulfur that was from two to four times the permissible maximum of the patent proportion. It did this to obtain an effect which was not then widely known sulfur would produce. That effect was double: first, it hardened and made smooth the surface of the roll, and second, (whether the defendant knew it or not,) it acted to hold the *carbon in combined form* not merely on the surface but *throughout the section,* and produced the result (which the defendant did know) of hardening the whole metal, the very quality which later the patentees sought, and obtained perhaps in a greater degree, by the use of chromium. If sulfur in the proportion used by the defendant did hold carbon in combined form and did thereby harden the metal of the section, the defendant achieved the result in a way different from that disclosed by the patentees, for the patentees' way was by the use of chromium.

But the defendant did not long rely upon sulfur alone for the hardening of its metal, because it was well known that chromium would overcome the opposite effect of silicon and hold carbon in combined form and harden metal. Therefore, as a combined chemical and commercial expedient, the defendant began as early as September, 1911,

(six months after resorting to sulfur and two years before the Adamite patent,) to use an iron ore known as Mayari ore, because, unlike any other iron ore, it contained in its natural state the alloying elements of chromium and nickel. It used this ore with these two chemical elements in order to obtain in the metal of its rolls the very hardening effect which chromium was then known to produce, and the toughening effect which nickel was known to produce. By hundreds of assays of metals made through two years before the patent, the defendant showed that, in the manufacture of its rolls, it used the chromium and nickel content in Mayari ore in varying proportions, (sometimes within the proportions afterwards given in the patent,) together with sulfur in much higher proportions than the sulfur proportion of the patent formula.

The natural chromium of Mayari ore was used to supplement the high sulfur of its previous practice, and the *two* became the agents employed by the defendant long before the patent to do the thing which those two ingredients were then known to do, namely, hold carbon combined and thereby harden metal. It is claimed by the defendant that it began this practice of roll metal making long before the patent and consistently pursued it down to the bringing of this suit. It is not disputed that the defendant began it before the patent and practiced it beyond the date of the patent in a manner which metallurgically and commercially was a distinct advance in the art.

Having shown that for their purpose sulfur is bad, certainly the patentees cannot complain of its use by another who finds that for his purpose it is good. The defendant says in effect:

"Sulfur is bad for some purposes, but I have found that it combines carbon and hardens metal. Therefore, for my purpose sulfur is good. I will use it in large quantities. Chromium does the same thing. Everybody knows that. I will use chromium too. I will vary the proportions of one or the other or of both of these ingredients in my alloy until I get the hardness I want. Nobody told me to do this. Certainly the patentees did not."

As we have said, the defendant had used chromium and sulfur in varying proportions to combine carbon and procure hardness for some years before the patentees obtained the patent whereby carbon is combined and hardness obtained essentially by chromium and in no degree by sulfur. Their licensee now complains that in continuing its early chromium-sulfur practice beyond the date of the patent, in different proportions, the defendant employed an equivalent of the alloy of the patent, and infringed. The charge arose in this way: After using Mayari ore for three years, with nickel and chromium running on an average of about .30% and .50% respectively, and in the relation of about three parts nickel to five parts chromium, with sulfur at about .16% the defendant, on August 17, 1914, raised the percentages of nickel and chromium to about .65% and .90% respectively, and lowered sulfur to about .13% on the average; and again, in 1915, the defendant lowered sulfur to about .12% and used nickel and chromium on an approximate *parallel* of about .80%. *In this the plaintiff charges the defendant with infringement.* It supports its claim of infringement by the argument, though the defendant's increase of chro-

mium and nickel was not in the relative proportions of these two elements as they are taught by the patent formula, (two parts of chromium to one of nickel,) that the substantial amount of sulfur made up for the low amount of chromium, (though itself within the patent range,) and they together produced the result which chromium would produce alone if used in the larger proportion of the patent formula, and that therefore the use of sulfur in connection with chromium was a fair equivalent of the latter element in the larger proportion of the patent.

This contention is without force as an argument of infringement, unless it is accompanied with evidence that the product of such an equivalent was Adamite. If the product was something else, whether as good or not so good, it did not infringe even if the formula used were the equivalent of that of the patent. The grant of Letters Patent to Speer and Forster did not deprive the defendant of its right to continue its long established use of high sulfur, or its almost equally long use of chromium and sulfur to harden roll metal by combining carbon; nor did it restrict the defendant to the precise proportions in which it had before used those two elements; nor did it prevent it using them in higher proportions, even under the plaintiff's theory of equivalency, when the resultant product is not Adamite. It is then pertinent to inquire—What was the defendant's alleged infringing product? The plaintiff says it was Adamite, and proceeds to prove it in two ways, first, by analyses of the alloy, and, second, by its performance.

In seeking to establish infringement by proof that the analysis of Phoenix Metal (the defendant's product) was within the range of the patent analysis, the plaintiff fell into the identical fault in which the defendant fell in its effort to prove anticipation by analyses. There the plaintiff stoutly complained that the defendant treated the case as purely one of analyses; that it utterly ignored the physical characteristics of the products, and thus failing to show that the products of those analyses were Adamite, failed to show anticipation. In this we have found the plaintiff was right. Now the plaintiff, in its endeavor to prove infringement, pursued precisely the same fatal course by treating that issue as one of analyses, utterly ignoring the physical characteristics of the alleged infringing products, and likewise failing to show that the products were Adamite.

The physical characteristics of true Adamite are many and pronounced. This we must believe, for the patentees say so. The range of analysis, however, is broad and uncertain, with corresponding uncertainties in the resultant product. Within a given range, plaintiff's expert testified that he would "expect" "approximately" the product of Adamite, but it was also testified that within the lower and upper ranges of the claim, the lines of demarcation between Adamite and steel on the one hand and between Adamite and cast iron on the other, are hard to determine, because in one range the metal "shades off" into steel and in the other it "shades off" into cast iron. Hence it is certain that some products within the broad range of the analysis of the patent will not be Adamite; while others may be Adamite not

with fixed but with many variations of characteristics. The central question of infringement, therefore, is, whether the product of the defendant is Adamite within *any* of its variations.

For proof that Phœnix Metal is Adamite, the plaintiff relies, as we have said, first, upon approximate similarity of analyses, and second, upon approximate similarity of performance. The plaintiff has shown by its own witness that identity of the two metals cannot be established by proof even of identity of analyses; and it is very certain that similarity of performance does not establish identity of the metals. Phœnix Metal may perform as well as Adamite, yet be an altogether different metal. Evidence of similarity of performance, however, has probative value; this we have considered.

The plaintiff's proof of performance goes to the lasting qualities of the two metals, due to similarity in their great strength. Yet, even when endeavoring to prove identity of metals by similarity of strength, the plaintiff showed a dissimilarity in the metals by showing a dissimilarity in their strength. It proved that the tensile strength of Adamite is 70,000 to 100,000 pounds per square inch, while that of the Phœnix Metal is 45,000 to 55,000 pounds, and that of ordinary soft steel is 30,000 to 40,000 pounds. From this it appears that the tensile strength of the defendant's low chromium and high sulfur hardened product is but 50% greater than that of soft steel, while the tensile strength claimed for Adamite is about 200% greater. This radical difference in tensile strength indicates a radical difference either in the quantity or form of carbon or in both, and that the two metals are not the same.

But proof of identity of the two metals was not restricted by the nature of the metals to evidence of similarity of chemical analyses and performance. It might have extended to their physical characteristics. These are such as to make them readily distinguishable, and it is to such that we naturally look in our effort to determine whether the two metals are the same or are different. Recognizing this, the defendant did not rely alone upon the difference between the analysis of its alloy and that of the patent in defending the charge of infringement, but proceeded to show by evidence of physical facts that Phœnix Metal is not Adamite. On the other hand the plaintiff produced no evidence of physical facts in support of its charge that Phœnix Metal is Adamite.

Stated briefly, the proofs are these: The patentees say in their specification:

"We have not found it feasible or possible to produce our alloy (Adamite) commercially *in a cupola* or like furnace. * * * Also the constituent analyses as given for our alloy *cannot be obtained from the cupola* or like furnace in the case of castings of larger section. In attempting to make an alloy in a cupola the percentages of silicon, *sulfur*, phosphorus, we have found too high to get uniform results. We have found that *any such percentages of silicon, sulfur* and phosphorus as are contained in the metal, the tests of which are reported in the Iron Age, as above stated, *would be destructive* to the remarkable results which we have obtained and described herein."

The plaintiff made no attempt to prove that Phœnix Metal is made in the manner disclosed by the patent for the manufacture of Adamite, or that Adamite with high sulfur in alloy can be made in cupolas,

notwithstanding the statement of the specification to the contrary. The defendant, however, proved its method of manufacture, and showed that Phœnix Metal rolls,—"castings of larger section,"—with their high sulfur content, are and have always been made in cupolas and are made in precisely the way the patentees state in their specification it is impossible to make Adamite. If Adamite cannot be made in cupolas, then certainly Phœnix Metal made in cupolas is not Adamite.

The patentees claim for Adamite the qualities of cheap tool steel. Upon specific analyses they say:

"The results obtained in these cases were materials which were hard and resistant to the action of abrasion under heat, and susceptible of being forged. * * *

"We believe we have made a discovery of a new composition of metals, which in its primary or cast state, resembles cast iron in its action under cutting tools in the lathe, under the acetylene torch and in its failure to show elasticity or elongation or reduction of area over ordinary cast iron; whereas in its secondary or worked state its ultimate strength, its forging and wearing qualities class it with a steel product. * * *

"Our product is suitable for the greatest variety of uses. It may be used for castings, both large and small, where wear and resistance to heat are important factors. It may also be used for tools, such as hammers, axes, picks, shovels, saws."

The plaintiff produced no proof that Phœnix Metal is a tool steel metal suitable for the many uses or for any of the uses for which Adamite is stated by the patentee to be suitable; that its action under cutting tools or under the acetylene torch is like that of Adamite; that like Adamite it lacks elasticity, elongation or reduction in area over ordinary cast iron; and most important of all, the plaintiff produced not the slightest proof that Phœnix Metal is forgeable. The forgeability of Adamite is one of its distinctive features. Had Phœnix Metal possessed that quality, it could easily have been proved. That Phœnix Metal does not possess it is to be inferred not alone from the plaintiff's silence but from the large sulfur content of the metal, the red shortness incident to such content, and the consequent difficulty or impracticability to forge metal with that property.

It was testified, that while both metals show unusual strength, the tensile strength of Adamite is nearly if not quite double that of Phœnix Metal. There is no evidence that the alleged infringing rolls from which turnings were taken and analyses made were of Adamite strength.

Rolls of the two metals are used at times in different stands for different purposes, according to differences in their characteristics. Rolls of Phœnix Metal are frequently used for finishing purposes, while Adamite rolls are not usually so employed, because they are much rougher, in fact, rougher even than sand iron rolls. When so employed, Adamite rolls wear rough sooner than Phœnix Metal rolls. Rolls of Phœnix Metal finish up smoother and hold their surface better than rolls made of Adamite.

In cutting rolls made of the two metals, different lathes are required. In roughing off Phœnix Metal rolls a very high grade and high speed steel tool is required until the skin is removed, then they may be finished

by a common carbon steel tool, but in roughing off Adamite rolls the high grade high speed tool has to be used throughout.

The rolls from which turnings were taken and analyses made were not subjected to these distinguishing tests.

Testimony as to physical characteristics of the two metals was given by rolling mill men who had operated rolls made of both metals. That the two metals are readily distinguishable was testified by all. The general trend of their testimony is shown by the testimony of one witness given in the margin.[1]

In determining the issue of infringement, as raised and tried in this case, we are restricted to and controlled by the testimony produced in this case. How such an issue may be determined upon other evidence we venture no opinion. But from the testimony in this case, as we read it, it clearly appears, that Phœnix Metal and Adamite, while having an approximate similarity of analysis and performance, possess physical characteristics which distinguish one from the other; that these characteristics are readily susceptible of proof; that the defendant produced testimony that the metal of its rolls possessed the distinctive physical characteristics of Phœnix Metal, and that the plaintiff produced no testimony to the contrary. While charging infringement because of the approach of the analysis of Phœnix Metal to the analysis of Adamite, the plaintiff did not prove that the rolls from which turnings were taken and the analyses upon which it relies were made, had any of the physical characteristics of Adamite. In fact, the plaintiff failed to prove that Phœnix Metal is Adamite, and therefore failed to prove infringement.

The burden of proving infringement rests upon the party charging

---

[1] Q. You have had experience at the Page Company plant with both the Phœnix Metal and Adamite rolls, have you?

A. Yes, sir.

Q. State from your experience, what, if any, difference you have observed between those two rolls?

A. Well, I would say that the Phœnix Metal, the surface of it—we buy it in the rough, and the surface of the Phœnix Metal is a very heavily scaled roll, for it takes a very high speed tool steel to cut it. But after the surface is thoroughly clear, it has a resemblance of a spotted chilled roll. That is to say, with a roll of 1-inch of chill on an ordinary sand iron roll, while on the face of that I would have on the rolls the same appearance on the material with the Phœnix Metal as I have on the spotted chill. Now, *an Adamite roll doesn't resemble that in any way,* because the Adamite roll has a leaning towards steel. *If I cut an Adamite, I can always know it;* it has a much rougher surface; whereas the Phœnix roll has a smooth finish at all times; and its cuttings and its castings are smooth; whereas the Adamite is rough. It has a pull against the tool that causes the surface to be rough. It has, as you would term it a wave in the steel roll; you would find it in the Adamite, only not so prominent in the Adamite.

Q. And to what extent inwardly from the surface, from your observation, and dressing of these Phœnix rolls, does this condition exist?

A. Well, the Phœnix Metal, as far as we have dressed, has shown no difference whatever; and we had occasion, on one occasion, to put a part of the Phœnix roll under a scull cracker and break it, and we found the fracture to be perfect from the center out; perfect. Now, a Phœnix Metal is much coarser in grain on the inside, and towards the center is slightly coarser than the outside.

it. If the peculiar subject matter of the patent makes such proof difficult, that is its misfortune; it cannot operate against the party charged. When infringement is charged it must be proved. In this case, we think it has not been proved. Therefore, we find with the trial court upon this issue, and direct that

The decree below be affirmed.

BUFFINGTON, Circuit Judge concurred in the finding of the majority of the court that the patent in suit was valid, but dissented from the finding of the majority on the question of infringement.

## On Petition for Rehearing.

WOOLLEY, Circuit Judge. In disposing of the plaintiff's petition for rehearing, we shall not enter upon a discussion of the metallurgy of the alloy of the patent and of the alleged high sulfur, low nickel-chromium infringing alloy. Such a discussion cannot easily be confined within reasonable bounds, and, if pursued, would serve no purpose other than to assure the unsuccessful litigant that the court understood the case and to show the grounds upon which it based its decision. We shall do no more than indicate in the briefest way the considerations which moved the court to its judgment.

The complainant again insistently maintains that the approximate similarity of performance of the two metals in point of strength and endurance, is proof that the two metals are identical. But proof of such similarity of performance loses much of its probative force in view of the conceded dissimilarity of chemical composition. As it is conceivable that two metals differently composed as to proportions of the same ingredients may be similar in performance yet be different in fact, the complainant asks us to give to its evidence of performance a value, greater, we think, than it is entitled to receive.

The case turns on the chemical composition of the two alloys, considered with reference, not to ingredients, but to proportions of ingredients. If their composition is different (aside from equivalents), the two alloys are different, though their performance be similar, and there is no infringement; for the invention of the patent is found in new proportions of old ingredients, and nowhere else. That is all the patent teaches; it leaves everything else to the skill of the founder.

The chemical composition of the defendant's alloy is concededly different in proportions from that of the patent, and upon this difference the defendant chiefly relies to distinguish its alloy and to meet the charge of infringement.

Just here the complainant had the task of proving that two alloys, whose ingredients are the same but are in different proportions, are one and the same alloy; a task made particularly difficult by the fact that the proportions of one ingredient are not only different but are fundamentally antagonistic. This, as pointed out in the opinion, the complainant did not succeed in proving. This is the central question of the case to which all others are incidental or cumulative, and failing in this, we think the complainant failed to prove infringement.

The apparent mistake of the court in stating that the defendant

made its metal in cupolas, and in deducing the conclusion that metal thus made could not be Adamite in view of the statement of the patent that Adamite cannot be produced (commercially) in cupolas, does not touch the main question of chemical composition of the two metals, and does not affect the complainant's lack of proof that the two metals, differently composed, are the same. The question of infringement turns not upon the appliance or the kind of furnace in which the alleged infringing product is made—for the patent claims teach nothing as to this—but upon the proportions of ingredients with which it is made. Of these, the proportion of sulfur is the critical proportion in this controversy.

In the alloy of the patent the element of sulfur is present. It is not introduced into the alloy by the patent; it is put there by nature. It is dealt with by the patent because it is there; and being there, it is not treated as an element having anything to do with the production of the alloy, and it is not used for any purpose. It is considered and treated as an impurity unavoidably present and certainly dangerous, and, for that reason the patent directs that it be reduced to a low minimum. The one thing the patent teaches about sulfur is that it must be gotten rid of, and that it must not be present above a proportion, which, by its own terms, the patent limits to .05.

In the defendant's alloy, the defendant adds sulfur to what nature supplies. Sulfur is there because it is put there. It is put there for a purpose, and for a purpose not recognized by the patent and in a proportion denounced by the patent. Because of our belief that the patent involves invention and is valid, and because of its manifest importance to the metallurgical art, we gave a full and a very serious consideration to the complainant's theory of the defendant's use of sulfur as a substitute for or an equivalent of any deficiency of the proportion of chromium in the alloy of the patent. But the theory failed in view of the undisputed fact that the defendant began the practice of using sulfur in its alloy in from double to treble the proportion taught by the patent long before the patent was applied for, and consistently pursued it to the bringing of this suit (Exhibit Book 192–225); and in view of the further fact, that while the defendant used and varied its nickel-chrome content throughout the same period, as it had a right to do, its radical change in that content, complained of as a resort to the nickel-chrome proportions of the patent, was not a change of nickel and chromium in the relation taught by the patent.

As the defendant's use of high sulfur had long been practiced together with the use of nickel and chromium in varying proportions (sometimes within the proportion of the patent subsequently granted), it was difficult to believe that the defendant's continued use of sulfur in substantially the same high proportion, was an equivalent of or a substitute for a deficiency in the chromium proportion of the patent, resorted to by the defendant as an expedient or means by which to infringe the alloy of the patent. As this was the very centre of the issue of infringement, we think the complainant failed to prove that Phœnix Metal is Adamite.

As these are the principal considerations that moved the court to its judgment, we see no occasion for allowing the plaintiff to introduce additional evidence on collateral matters.

The petition for rehearing is denied.