TONOPAH MINING CO. et al. v. VINCENT.

(Circuit Court of Appeals, Third Circuit. February 25, 1914.)

No. 1800.

1. PATENTS (§ 167*)—WORDS AND PHRASES—"LEACHING."

Where a specification of a patent for an ore-reducing process described the third step as "leaching" the ore by the use of cyanide solution whereby the finer values were dissolved, the word "leaching" was used in its ordinary sense, namely, to cause a fluid to percolate through the pulverized ore.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. § 167.*]

2. PATENTS (§ 328*)—PROCESS FOR TREATING ORES—INFRINGEMENT.

Brown's patent, No. 781,711, for a process for treating ores, the essential feature of which consists in subjecting the crushed ore to the cyanide process for the recovery of fine values before concentration, held not infringed by a process which, though using the cyanide solution in the earlier stages of the process preparatory to concentration, employed effective finished and final concentration as the initial and intermediate step in which the fruits of concentration are withdrawn from the process, after which the by-product was treated by a protracted process of cyaniding.

Appeal from the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Suit in equity by Joseph A. Vincent against the Tonopah Mining Company and another. From a decree for complainant (207 Fed.

579), defendants appeal. Reversed and remanded, with directions to dismiss.

Jos. C. Fraley, of Philadelphia, Pa., and J. Harvey Whiteman, of Wilmington, Del., for appellants.

Horace Pettit, of Philadelphia, Pa., for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

BUFFINGTON, Circuit Judge. By this bill the plaintiff, Joseph A. Vincent, owner of patent No. 781,711, granted to Alden H. Brown, February 7, 1905, for a process of treating precious metal bearing ores, charged the Tonopah Mining Company and others with infringing the two claims thereof. The court below, in an opinion reported at 207 Fed. 579, found the patent valid and said claims infringed. From a decree so holding, defendants appealed.

Brown's patent, as recited in the specification, "relates to a process for the treatment of precious metal bearing ores, and embraces the treatment of the ore by a solution of cyanide of potassium or of other alkaline cyanide and the subsequent treatment of the ore by concentration." The specification states that:

"It has been the practice for many years in plants where the concentration and cyanide processes are used in combination, to treat the ore, first, by concentration, and, secondly, by cyanide. The process which I have invented and which I now have in successful operation is a reversal of this proceeding with the addition of certain special features in connection with the cyanide step."

The second or broad claim is for these two steps in succession, to wit:

"2. A process of treating sulfide ore consisting first in subjecting the raw or unroasted ore to the action of a cyanide solution whereby the finer metallic values are dissolved, and, second, subjecting the ore or tailings to concentration whereby the coarser values are recovered."

The first claim also includes the two foregoing steps, but "certain special features in connection with the cyanide step" are detailed in the claim, which is:

"1. The herein described process for the treatment of ore consisting in first pulverizing the ore in the presence of cyanide solution; second, subjecting the ore to hydraulic classification by the introduction of cyanide solution at the bottom of an overflow tank to produce an ascending current; third, leaching the ore by the use of cyanide solution whereby the finer values of the ore are dissolved; fourth, removing the dissolved metallic values from the ore in any suitable manner; and finally subjecting the residue of ore to concentration."

The cyanide process, which process is described in Moore v. Tonopah, 201 Fed. 532, 119 C. C. A. 626, a case in this court, consists in subjecting metal-bearing ores to cyanide of potassium dissolved in water. The result is that the metal is disengaged or dissolved and is carried in solution. Such solution is then removed from the residue of the ore by percolation, filtering, or decantation, and is ultimately subjected to electro-chemical action whereby the precious metal is precipitated.

On the other hand, concentration is a mechanical process of removal. It is usually done on concentration tables. Such tables are slightly inclined and have grooves, across which the finely divided ore is slowly carried by a shallow current of water; the table being given a jerky, reciprocating motion. The result is that the heavy constituents work along and run over the edge of the table at different places from the lighter ones. It will thus be seen that the two processes of cyaniding and concentrating are distinct, well known, and operatively different; one is chemical, the other mechanical. As noted by the patentee, it was usual to concentrate first and cyanide last, and the patentee advised a reversal of this process. His object in so doing, he states, was because where concentration was used in advance of cyaniding there was a large loss in values by reason of the fact that the necessary water treatment in connection with the reduction of the ores to a fine state of division resulted in a taking up by the water of a large percentage of ore values. As a result:

It was "difficult, if not impossible, to settle these values for further treatment within the limits of a plant of ordinary construction, for the reason that in the case of many ores these slime values remain in suspension for many hours. It will therefore be understood that in the case of ores of this sort, if amalgamation, concentration, or other process involving the use of water for crushing or treatment is used preliminary to the cyanide process, it will be necessary to have a very extensive system of settling tanks in order to recover these suspended values and hold them in the mill, so that they may be subjected to further treatment. It is a well-known fact that the cyanide process recovers only the fine values, and in the treatment that I have devised these fine values are recovered by the cyanide process in the beginning, leaving only the coarser values, which are readily recoverable by concentration; the latter being specially adapted for saving this class of values."

It will be noted that no new principle of operation, either in cyaniding or concentrating themselves, was disclosed in this patent. It was at most simply a more effective, workable treatment, and it will thus be seen that transposition of concentration from initial to final stage, and of cyaniding from final to initial stage is the substantial disclosure of this device. Assuming, for present purposes, that this change was original with Brown, and that it involved invention, it must be conceded the field of invention was narrow, and Brown's claims should not by construction be enlarged to include within infringing fences processes which were not within the field of his inventive disclosure. Now without entering into details, it suffices to say that the second claim embodies the two elements of: First, cyaniding, viz., "subjecting the raw or unroasted ore to the action of a cyanide solution whereby the finer metallic values are dissolved"; and, second, concentrating, viz., "subjecting the ore or tailings to concentration, whereby the coarser values are recovered." This claim is perfectly clear. A reading of the patent shows precisely what the patentee disclosed, and the claim as precisely claims that disclosure. There is no ambiguity in either disclosure or claim. They are self-sufficient and self-explanatory. The first element is the use of the well-known cyaniding process as the initial and finished first step of the process. The specification thus unmistakably refers to both the initial use and also the completion of cyaniding in this first stage of Brown's process. Thus:

"My invention relates to a process for the treatment * * * by a solution of cyanide of potassium * * * and the subsequent treatment of the ore by concentration. * * * It has been the practice * * * to treat the ore first by concentration, and, secondly, by cyanide. The process which I have invented * * * is a reversal of this proceeding. * * * If * * * concentration * * * is used preliminary to the cyanide process, it will be necessary to have a very extensive system of settling tanks in order to recover these suspended values and hold them in the mill, so that they may be subjected to further treatment. * * * In the treatment that I have devised these fine values are recovered by the cyanide process in the beginning, leaving only the coarser values, which are readily recoverable by concentration."

The drawings illustrate a wet crushing plant.

"I will say, however, that so far as the broad idea of employing the cyanide step *previous* to concentration is concerned, the advantage in this respect would be equally great if dry crushing instead of wet crushing were employed. * * * From the tanks *II* the gold-bearing solutions pass to the zinc boxes *JJ*, where *the values are precipitated.* * * * After the cyanide treatment has been *completed*, the sand tailings from the leaching tank *G* are transferred * * * to the tailings bin *P*. * * * The mixer *K* distributes the tailings to the concentrating table *L*."

These extracts show that all steps prior to the said tailing reaching the concentrating table concerned cyaniding, and cyaniding alone. Indeed, the cyaniding of Brown's process had, at this stage, done all that cyaniding was intended to do. In other words, it had resulted, as cyaniding ordinarily did, in "the gold-bearing solutions pass(ing) to the zinc boxes *JJ* where the values are precipitated."

Following this completed process of cyaniding came the second step of the claim, namely, "subjecting ore or tailings to concentration where the coarser values are recovered." Concerning this step there is no ambiguity. It simply takes the sand tailings, which the finished cyanide process had left in the mixer *K*, and concentrates them. Cyaniding has finished its assigned work and recovered its share of the metal product. The sand tailings were the by-product of cyaniding. It was with this by-product that concentration took up its part of the process. Concentration was so well understood that the patent simply says:

"In regard to the matter of concentration, I will say that any desired system may be used, either the standard practice, * * * or any of the more recent oil-concentrating processes, in which the affinity of certain oils for metallic sulfids or other valuable minerals is made use of in order to effect the proper separation."

The first claim is based generally on these two elements, viz., cyaniding and concentration, but embodies in the cyaniding step those "special features in connection with the cyanide step," which the patentee disclosed and thus claimed. As we read that claim, the first four elements, viz., "pulverizing the ore in the presence of the cyanide solution; * * * subjecting the ore to hydraulic classification by the introduction of cyanide solution at the bottom of an overflow tank to produce an ascending current; * * * leaching the ore by use of cyanide solution whereby the finer values of the ore are dissolved; * * * and removing the dissolved metallic values from the ore in any suitable manner"—all these are specific substeps of cyaniding; those "certain special features in connection with the cyanide step,"

as the patentee aptly says. They culminate and effect cyaniding. Unitedly they are the same as the first and broader stated first element of the second claim, viz., "subjecting the raw or unroasted ore to the action of the cyanide solution whereby the finer metallic values are dissolved." It follows, therefore, that all the four first elements of the first claim are to be treated as agencies culminating in cyaniding, and so regarding them it follows that, however much some other process may utilize one or more of these elements, if they are not made use of in a process that culminates in and completes cyaniding as its first and pre-concentrating step, such element or elements are not employed to infringe the cyaniding initial step of these two claims.

[1] We here note that the discussion of this case seemed to center on what was meant by the third step, "leaching the ore by the use of cyanide solution whereby the finer values of the ore are dissolved," and, the fourth, "removing the dissolved metallic values from the ore in any suitable manner." To us this is plain. "Leach" is a word of recognized import, namely, to cause a fluid to percolate through. Brown's teaching was by the cyanide process, namely, "leaching the ore by the use of cyanide solution," and the other words, "whereby the finer values of the ore are dissolved," merely state the result of such percolating or leaching. What was meant by leaching was well understood in the art. It was thus described in Moore v. Tonopah, supra:

"The cyanide ore process came into use about 1887, and is the real foundation of the tremendous increase of gold production in the last two decades. It is now the prevalent method of treatment. In it the ore is first crushed and then placed in tanks containing a solution of cyanide of potassium. This solution percolates through the crushed pulverized mass, and, being a solvent of gold, carries off such gold as is subjected to its action. This is called 'leaching,' and any crushed ore through which percolation took place was termed 'leachable.' "

As the term was thus well understood in the art, we are justified in giving it that meaning in this claim. So doing, it follows that the fourth step, which "removes the dissolved metallic values from the ores," merely removes the metallic values which the leaching has dissolved.

[2] This two-staged process—first cyaniding, next concentrating—being the only disclosure of Brown and the claims embodying those two separate, individual, completed stages or steps, it follows that any process which makes concentration an intermediate and completed step, one that precedes final and effective cyaniding, is a process different from the one Brown disclosed and claimed. Measuring the defendant's process by these standards, it follows that infringement is not shown, for, without entering into a detailed description of its plant, it suffices to say that a study of its workings has brought us to this conclusion. The defendants, in common with Brown, it may be conceded, are using the cyanide solution in the earlier stages of their process, and to that extent we may say initially utilize the general chemical treatment incident to cyaniding, preparatory to concentrating. But beyond this the resemblance ceases, for by defendant's process concentration —effective, finished, and final—is the initial and intermediate step in their process. At such intermediate step the fruits of concentration

are withdrawn from the process, and this first completed step of the process, the one "whereby the coarser values are removed," is, as we have seen, the second step of Brown's process.

After the defendant's concentration is finished, the by-product goes forward to be subsequently treated by a protracted process of cyaniding. This is at variance with Brown's process in three respects: First, cyaniding follows concentrating; second, it is a system condemned by Brown and one he sought to avoid, in that where "concentration * * * is used preliminary to the cyanide process it will be necessary to have a very extensive system of settling tanks in order to recover these suspended values and hold them in the mill so that they may be subjected to further treatment"; third, the defendant's process which physically withdraws from the operation of the process the products of concentration in advance of withdrawing those of cyaniding, makes the process one avoided by Brown, viz.:

"It is a well-known fact that the cyanide process recovers only the fine values, and in the treatment that I have devised these fine values are recovered by the cyanide process in the beginning, leaving only the coarser values, which are readily recoverable by concentration, the latter being specially adapted for saving this class of values."

It is apparent, therefore, that the defendant's device, which the proofs show has been of great practical worth, owes its worth to the fact that it is built and operated in express disregard of the instructions of Brown's patent. Without passing on the question of the validity of that patent, it suffices to hold defendants do not infringe.

The decree below is therefore reversed, and the case remanded, with instructions to dismiss the bill for noninfringement.