### ROBESON PROCESS CO. v. ROBESON et al.

(District Court, D. New Jersey. October 26, 1923.)

1. **Patents ⓒ⊶129—Corporation organized by assignor of patents held estopped to deny their validity.**

   A corporation organized by the assignor of patents, who held all its common stock, and elected its board of directors, and was left by them in control of its business, *held* estopped equally with him to deny the validity of the assigned patents.

2. **Patents ⓒ⊶202(2)—Assignor not estopped to deny infringement.**

   The estoppel of the assignor of a patent to deny its validity does not preclude him from denying its infringement, and on that issue the construction of the patent, and its scope, as limited by the prior art, must be determined by the same rule which would be applied between the patentee and a stranger.

3. **Patents ⓒ⊶161—Patentee of improvement may claim only his individual advance over prior art.**

   The patentee of an improved process or product owns exclusively only so much as marks his individual advance over all prior patentees.

4. **Patents ⓒ⊶328—833,634, for process of treating waste sulfite liquor and resulting product, held not infringed.**

   The Robeson patent, No. 833,634, for process of treating waste sulfite liquor and compound obtained, is not a basic patent, and as limited by the prior art is not infringed by the process or product of the Robeson patent, No. 1,445,603, which differs both as to process and product.

5. **Patents ⓒ⊶231—Identity of product not a test of infringement.**

   Identity of product does not establish infringement, unless it is obtained by substantially identical means or method.

6. **Patents ⓒ⊶328—1,069,029, for process of treating roads, held not infringed.**

   The Robeson patent, No. 1,069,029, for a process of treating roads, is limited to the application to road surfaces of the product of patent No. 833,634, to the same patentee, and is not infringed by the use of a different product.

In Equity. Suit by the Robeson Process Company against Jacob S. Robeson and Jacob S. Robeson, Inc. Decree for defendants.

Duell, Warfield & Duell, of New York City (F. P. Warfield and D. A. Woodcock, both of New York City, A. M. Houghton, of Washington, D. C., and A. Dayton Oliphant, of Trenton, N. J., of counsel), for plaintiff.

Irving M. Obreight, of New York City (Clair W. Fairbank, of New York City, and John O. Bigelow, of Newark, N. J., of counsel), for defendants.

RUNYON, District Judge. This suit is brought for infringement of patent, and is based upon two United States patents, No. 833,634, for process of treating waste sulfite liquor and compound obtained, and

No. 1,069,029, for process of treating roads, etc. The acts charged by plaintiff as infringement are set forth in its bill of complaint as follows:

"And said defendants have further threatened within the district of New Jersey to infringe said patents in suit, and each of them, by offering to supply and apply to roads within the state and district of New Jersey a lignin binder, which, in its composition and use, will necessarily infringe said patents in suit; that defendants have * * * caused to be delivered to the New Jersey state highway commission a letter and inclosures, * * * and defendants have submitted bids under specifications of the state highway commission of the state of New Jersey; * * * that defendants intend and threaten to supply and treat roads with lignin binder specified in said specifications, * * * and that by so doing defendants will necessarily infringe plaintiff's patents in suit."

The road contracts referred to in the bill of complaint were awarded to the defendant corporation August 3d, 1922, and the bill of complaint and motion for preliminary injunction filed August 7th, four days later. A preliminary injunction was issued August 29th, and upon appeal therefrom a hearing was ordered before the Court of Appeals on October 6th, which resulted in the vacating of the injunction upon the giving of a $25,000 bond by the defendants to abide the event.

These two patents in suit were issued to the defendant Jacob S. Robeson, and by him assigned to the plaintiff, Robeson Process Company. Robeson originally was the organizer, and for a considerable period of time the president, of the plaintiff company. In this connection, and in return for the transfer of the patent rights secured under the two patents, he received all the stock of the plaintiff company.

This course was adopted by certain paper manufacturers, to whom the Robeson patents came as a great boon—the J. J. Rogers Company, of Ausable Forks, N. Y., and the West Virginia Pulp & Paper Company, which has one of its plants at Covington, W. Va. The disposition of waste sulfite liquor is a serious problem to those manufacturers of wood pulp, whose processes bring it into being, and there had long been attempts on the part of many to solve the problem of its menacing properties. It polluted streams, and still does. It had been made the subject of threatened legislation in many states against paper manufacturers, and that legislation still threatens. It had for years been a veritable Frankenstein monster ever and always increasing in bulk and consequently the Rogers Company, to which Mr. Robeson made his early overtures, having spent upwards of $30,000 in experimental work designed to rid itself of the waste liquor and without success, welcomed a plan which seemed to offer a fair promise of deliverance from its troublesome by-product. At the outset, the potential marketability of the Robeson product did not especially interest the Rogers Company. Its chief concern was to rid itself of the liquor, and in furtherance of that concern, and in conjunction with the West Virginia Pulp & Paper Company, it contributed the funds necessary to build a plant for the operation of the Process Company, taking the company's bonds, secured by mortgage, in return therefor.

The company began its operations in 1905, and continued in a somewhat small and unprofitable way for several years, or until 1910, when, for the first time, the annual returns showed a profit. About 1914 or

1915 differences arose between the Rogers Company and the defendant Robeson, the nature of which is disputed, but with which we need not concern ourselves, otherwise than to note that as a result thereof the West Virginia Company purchased Mr. Robeson's stock, and there ensued on February 26, 1915, and June 26, 1916, respectively—(1) an agreement between Robeson and the Robeson Process Company for sale of the Robeson patents and the payment of royalties to Robeson; and (2) mutual releases covering all matters in difference between the parties.

Thus ended Robeson's connection with the Process Company, which continued in business, and has, during these intervening years, attained large proportions and established a substantial financial rating, being possessed of a plant and other assets of the approximate value of $1,-000,000.

On or about May 21, 1919, the defendant J. S. Robeson entered into an agreement with the York Haven Paper Company, of Pennsylvania, for the establishment of a plant for the manufacture of a product through processes belonging to him, "which he may or may not cause to be patented," and dealing with sulfite waste liquor; said agreement also having to do with the question of sales, royalties, etc. Upwards of a year thereafter, or on August 2, 1920, the defendant company was incorporated, and the defendant Robeson, on August 9, 1920, assigned all his interest in the above-mentioned agreement to said company.

On September 24, 1920, Robeson filed an application for a patent for the "treatment of sulphite cellulose liquors," and on August 3, 1921, an application for a patent for "process and composition for making roadways," both of which patents were granted on February 13, 1923, six or more months after the bill of complaint herein was filed.

The above constitutes in outline the history of the genesis and progress of events leading up to the present case. The question before the court has been expressed by defendant's counsel as follows:

"This is not an unfair competition case, nor one of interpretation of contracts, nor one of honest or dishonest business dealing. It is purely a case of alleged patent infringement. If the patents are not infringed, then the decree must be for the defendant; and, if they have, it must be for the plaintiff."

In reply to which plaintiff's counsel says:

"Now, I take it we can rely on that as establishing a fact, * * * and your honor has only then to determine whether or not the patents have been infringed."

[1] Pursuant to well-established principles of law and practice, the defendant Robeson was not allowed to deny the validity of the patents in suit, and for reasons and facts which, in my opinion, were compelling, the estoppel as to such denial was extended to include the defendant J. S. Robeson, Inc. The defendant Robeson was the main factor in the organization of this company, and to him was issued all the common stock thereof, which said stock, at the outset, carried the voting power. While he owned but 50 shares of the preferred stock, a small minority, and while, in accordance with the terms of the incorporation, four regular dividends having been omitted, the voting power was shifted from the common to the preferred stock, even under these con-

ditions Mr. Robeson, to all intents and purposes, continued in control of the company. To him alone, or to him and one other, were issued, from time to time, the proxies for the election of the officers of the corporation, and he and his joint proxy holder never had any dispute concerning this phase of the company's affairs. While the board of directors was composed of men of large interests and of the highest integrity and ability, they were of his own selection, were apparently satisfied with Mr. Robeson's management, and left him with so commanding a power as virtually to make the company, in the matter of its officers, activities, pronouncements, and policy, his alter ego. In my opinion, this state of facts has produced a condition which properly denies to the incorporation any rights not possessed by the defendant Robeson personally, so far as estoppel of any right to deny the validity of the patents in suit is concerned.

"If the estopped assignor enters into business with others, who derive from him their knowledge of the patented process or machine, and, availing themselves of his knowledge and assistance, enter with him upon a manufacture infringing the patent which he has assigned, they are bound by his estoppel. By the application of this test the defendants Pharaoh and Forbes are here bound by the estoppel of Carroll. When individuals thus estopped establish a corporation to carry on a business which they would be restrained from carrying on as individuals, then the corporation also is deemed in privity of estoppel with them, even though it contain some stockholders more or less ignorant of the history of the patent and of the transactions leading up to the incorporation. From these considerations it follows that all the defendants are here estopped to deny the validity of the patent here in suit. *Were this not true, then any estopped assignor could escape the effect of his estoppel by incorporating himself, and securing for his corporation a single bona fide stockholder for value.*" (Italics mine.) Mellor v. Carroll (C. C.) 141 Fed. 992, 993, 994.

"We do not think, however, that the defendant company can be said to be disassociated from Thomas. The facts that it entered upon its business under a license from Thomas and that he is its manager tend strongly to support the conclusion that the corporation is doing business in such association and privity with Thomas that it is subject to the same estoppel in favor of the plaintiff. Thus the corporation acting under authority from Thomas and under his general direction as manager may justly be said to aid and abet him in the infringement of the patents assigned by him, if there be infringement. These facts bring the case within the principle laid down in Woodward v. Boston L. M. Co., 60 Fed. 283, 8 C. C. A. 622; Marvel v. Pearl (C. C.) 114 Fed. 946; Continental W. F. Co. v. Pendergast (C. C.) 126 Fed. 381; Mellor v. Carroll (C. C.) 141 Fed. 992; Siemens-Halske E. Co. v. Duncan E. Co., 142 Fed. 157, 73 C. C. A. 375; Mergenthaler v. International T. M. Co. (D. C.) 229 Fed. 168. At least, the facts were sufficient to put upon the defendant corporation the burden of showing that other innocent third parties were interested in the corporation and controlled it." Leader Plow Co. v. Bridgewater Plow Co., 237 Fed. 376, 378, 150 C. C. A. 390, 392.

See, also, Daniel v. Miller, (C. C.) 81 Fed. 1000 (Dallas, C. J.).

[2] At this point, however, comes the question as to how much this estoppel carries with it. Is it to be considered so all-embracing as to preclude any consideration of prior art? For the purposes of this action, are the patents in suit to be taken as essentially pioneer, with no background of anterior activities or patents along kindred lines? Or are we to be permitted to examine such prior art, with a view to ascertaining, not only the history of the art in general, but also the scope of

the patents, and the nature and extent of that which Robeson had an exclusive right to assign to the Robeson Process Company?

"It seems to be well settled that the assignor of a patent is estopped from saying his patent is void for want of novelty or utility, or because anticipated by prior inventions. But this estoppel, for manifest reasons, does not prevent him from denying infringement. To determine such an issue, it is admissible to show the state of the art involved, that the court may see what the thing was which was assigned, and thus determine the primary or secondary character of the patent assigned, and the extent to which the doctrine of equivalents may be invoked against an infringer. The court will not assume against an assignor, and in favor of his assignee, anything more than that the invention presented a sufficient degree of utility and novelty to justify the issuance of the patent assigned, and will apply to the patent the same rule of construction, with this limitation, which would be applicable between the patentee and a stranger." Noonan v. Chester Park, 99 Fed. 90, 39 C. C. A. 426.

See, also, Rollman Mfg. Co. v. Universal Hardware Works (D. C.) 207 Fed. 97; American Specialty Stamping Co. v. New England Enameling Co., 176 Fed. 557, 100 C. C. A. 193; H. D. Smith & Co. v. Southington Co., 247 Fed. 342, 159 C. C. A. 436; Babcock & Wilcox Co. v. Toledo Co., 170 Fed. 81, 95 C. C. A. 363; Schiebel Toy & Novelty Co. v. Clark, 217 Fed. 760, 133 C. C. A. 490.

That there was prior art cannot be denied. The patents in suit, while their validity cannot be impeached by the defendants, were nevertheless not basic. Through a long series of prior patents granted, we know that the treatment of waste sulfite liquor has been the basis for thought and experiment on the part of many, and an examination of the claims of these patents shows points of similarity, more or less closely related, when compared with the patents in suit, which, as already said, although valid beyond the power of the defendants to deny, are valid, not as patents which venture into new and untried fields, but as those which, profiting by the experience and discovery of earlier explorers, contribute something of novelty and usefulness in addition thereto.

If in the combination of factors entering into a patent are certain ones consisting of the results of others' patents, patents which have expired by the statutory limitation of time, then, so far as these prior patents are concerned, the later patentee has drawn upon the public's possession to aid him in his labor of improving thereon. Any one else has the same privilege. The patents have lost their exclusiveness. They are common property, belonging to every one in equal measure. It follows, therefore, that the later patentee, while his combination of old and new may gain for him a thoroughly good and valid patent, can nevertheless lay exclusive claim only to that portion of the combination which is the creature of his own brain and skill. He cannot, by utilizing as a portion of his composite work the vitiated remains of others' discoveries, give them a new lease of life, and thus deny to the public a possession to enjoy which it has waited for 17 years.

[3] And so, as he owns exclusively only so much of his own patent as marks his individual advance over all prior patentees, so in assigning such patent to another, his assignment, in the very nature of things, can transfer no more than such portion, for his assignee owns the re-

mainder thereof just as much as he does, just as much as anybody else does, for it is public property. Leader Plow Co. v. Bridgewater, 237 Fed. 376, 150 C. C. A. 390 (C. C. A. 4th):

"When Thomas assigned the Hanger and Thomas and Hanger patents, he asserted them to be valid, and he is estopped to deny their validity. He was not estopped, however, from showing the limits of the assigned patents by evidence of the prior art, or any other relevant fact. Martin, etc., Co. v. Martin, 67 Fed. 786, 14 C. C. A. 642; Automatic S. Co. v. Monitor S. Co. (C. C.) 180 Fed. 983; Noonan v. Chester Park Co., 99 Fed. 90, 39 C. C. A. 426; Smith v. Ridgely, 103 Fed. 875, 43 C. C. A. 365; Rollman v. Universal H. Works (D. C.) 207 Fed. 97; Plunger E. Co. v. Stokes, 212 Fed. 941, 129 C. C. A. 461."

It consequently follows that, if infringement is to be found, it must be a trespass located within the domain covered by Robeson's individual contributions, and not within that portion of either patent in suit which consists in the appropriation and utilization by him of the discoveries of prior inventors, which, through the passage of time, had become public property. Frank, in 1892, was granted a patent in which occurs the following language:

"In carrying out my invention, I employ the waste liquor of bisulphite fiber, or wood pulp, driven off during the process of manufacturing paper stock by the bisulphite of lime process, which is evaporated until it has the consistency of sirup," etc.

In 1895 a patent was granted to Carl D. Ekman for a "process of obtaining adhesive from sulphite liquors," and he describes his object as being:

"To obtain useful products from the liquor (hereinafter called the 'sulphite liquor') resulting from the manufacture of cellulose or fibers from wood or other fibrous plants by boiling under pressure with a sulphite solution, or a solution containing sulphurous acid and a base, such as potash, soda, magnesia, or lime. My invention, when carried out to its fullest extent, is a process or method of treatment which consists in first making the sulphite liquor alkaline by means of a suitable base, then concentrating it."

Honig, in 1897, received a patent for making a tanning extract. His patent says, in part:

"The lyes thus neutralized and clarified by decomposition are then concentrated in the usual manner to between 15° and 18° Baumé, and are then mixed * * * with a quantity of dilute sulphuric acid or other acid that will form an insoluble or difficultly soluble lime salt. * * * The whole is then heated by admission of steam until all the volatile acids are expelled. The precipitated sulphate of lime is filtered off, and the filtrate is brought into a vacuum apparatus to the desired final density (between 28° and 30° Baumé)."

Trainer, in 1901, evolved a patent for the making of blocks, etc., and his method consisted in evaporating or concentrating the waste liquids of cellulose manufactories to a consistency of pitch, or to a dry state, so as to form a hard, brittle body.

The patent of Drewsen and Dorenfeldt was granted for a process of utilizing sulphite lyes and contains the following statement:

"For this purpose our invention consists of a process of neutralizing the waste or spent liquors of sulphite and soda pulp mills by first neutralizing the liquor from one mill with the sodium containing liquor from the other mill; second, concentrating the neutralized liquor. * * *"

Honig again says:

"This invention relates to a process for the utilization of the waste sulphite liquors obtained in the manufacture of cellulose pulp, said process consisting in that the hot liquors exhausted from the digesters are employed," and " * * * said solutions are evaporated in vacuo in the usual manner, so as to bring them to a density of about 28° Baumé."

The Nettl patent, in 1904, speaks as follows:

"My process consists, chiefly, in first removing from the spent sulphite liquor the sulphurous acid;" then (2) treating the remaining liquor with an oxidizing agent; and then (3) the concentration. "The thus obtained mixture of liquids is then evaporated down to a very great concentration, for instance, so as to show a specific gravity of say 40° Baumé—which may be effected with preference in a vacuum apparatus."

With the foregoing patents constituting, in considerable measure, the prior art relating to waste sulphite liquors and their treatment, comes Robeson on the scene with a new patent, claiming to "have invented an improved process of treating waste sulfite liquor and compound obtained therefrom." Robeson goes on to say:

"My invention relates to the utilization of the waste liquor resulting from the manufacture of cellulose or fibers from various woods and woody materials, and particularly spruce wood (Picea sp.), by boiling under pressure with a solution containing sulfurous acid and a base or bases, such as lime or magnesia, under what is known as the sulfite process."

His method of treatment, as set forth in claim No. 4—

"consists in rendering such liquor substantially neutral by the addition of milk of lime and then evaporating said mixture in vacuo to a consistency of about 30° Baumé."

And his estimate of the scope of his original invention is couched in the following terms:

"I regard my invention as covering broadly any method of concentrating the solution, employing a relatively low temperature, below the normal boiling point of water, and operating under the exclusion of oxidation."

And furthermore, as descriptive of the identity of his product, and as differentiating it from the products of prior art, Robeson sets out in said patent three tests thereof as follows:

"Concentrated sulfite liquors made by my process differentiate from those of the prior art by the fact that they give no precipitate with strong solutions of gelatin or glue.

"The resultant dried mass from the concentrated and undecomposed liquor is in a flaky condition, and a fluid solution of the same, or the concentrated liquor formed by my method, may be distinguished from the liquor concentrated by prior methods or processes by its relative clearness or translucency and by its complete solubility in water, the products previously known having a markedly muddy or turbid appearance and containing particles of insoluble material resulting from decomposition.

"By the addition of a quantity of water equaling that removed by evaporation the original liquor may be reproduced, showing that its constituents have undergone no injurious change."

[4] In his patent, No. 1,445,603, granted February 13, 1923, for the "treatment of sulphite cellulose liquors," and which is the patent for the process practiced by the York Haven Paper Company, and

which has given rise to the present litigation, Robeson's description contains the following statements:

"I have found that liquor thoroughly and completely oxidized, as hereinafter set forth, may be evaporated at temperatures up to 300° F. without danger of injury or loss. * * * As a very important step in my improved process, I spray or mist the liquor into the air, so as to thoroughly and completely oxidize it, and at the same time evaporate a portion of the water and reduce the bulk."

While his second claim is for—

"the process of treating sulphite cellulose liquor, including spraying in a fine mist into the air the hot liquor as it comes from the digester and thereby oxidizing and partially concentrating the liquor and permitting escape of volatile acids therefrom, and collecting the unevaporated liquor for further treatment."

For the purposes of comparison, it may be well to note briefly some of the steps of the two processes, referring to the process of patent No. 833,634 as (1) and that as produced according to patent No. 1,-445,803 as (2), both processes taking the sulphite liquor as it comes from the digester.

(1) carefully excludes air in order to avoid oxidation. (2) courts oxidation through the medium of a thorough spraying of the liquor in the open air.

In (1) the liquor, as yet untreated, is taken to the liming tank. In (2) the liquor, minus certain ingredients removed through the spraying and oxidizing process, is taken to the liming tank.

In (1) lime, in careful avoidance of excess, is added in order to neutralize the free acid, or to leave but a slight amount not neutralized. In (2) lime is added to excess to act on loosely bound acid, not to render the liquor neutral, but alkaline.

In (1) there is no heating at this point. In (2) through the agency of steam coils extending into the tank there is a heating up to 185° F.

In (1) no precipitate is obtained. In (2) an inorganic precipitate of calcium monosulphite is obtained.

In (1) the excess application of lime would produce an organic precipitate. In (2) no such result is had through the excess application of lime.

In (1) no filtering is necessary. In (2) there is filtering through filter process.

In (1) the temperature is kept below 212° F. during concentration, while in (2) it runs up to 225° F.

In like manner the two products show certain differences.

The product in (1) is unoxidized and undecomposed; of (2) oxidized and in many features decomposed.

(1) is clear or translucent without filtering. (2) is not.

(1) gives no precipitate with glue solution. (2) does give precipitate.

By returning to the concentrated product of (1) the volume of water removed during the process, the liquor is restored to its original form as nothing but water has been removed therefrom. Such result cannot be obtained with the product of (2), as the process has removed certain elements altogether, such as acetic acid, formic acid, and sulphur dioxide, and has altered others.

It thus seems to me that these various differences prove an essential variation between the two processes, and that in the matter of oxidation especially the process of the later patent is in express disregard of the teachings and process of the earlier one.

"This two-staged process—first cyaniding, next concentrating—being the only disclosure of Brown and the claims embodying those two separate, individual, completed stages' or steps, it follows that any process which makes concentration an intermediate and completed step, one that precedes final and effective cyaniding, is a process different from the one Brown disclosed and claimed. Measuring the defendant's process by these standards, it follows that infringement is not shown, for, without entering into a detailed description of its plant, it suffices to say that a study of its workings has brought us to this conclusion. The defendants, in common with Brown, it may be conceded, are using the cyanide solution in the earlier stages of their process, and to that extent we may say initially utilize the general chemical treatment incident to cyaniding, preparatory to concentrating. But beyond this the resemblance ceases, for by defendant's process concentration—effective, finished, and final—is the initial and intermediate step in their process. At such intermediate step the fruits of concentration are withdrawn from the process, and this first completed step of the process, the one 'whereby the coarser values are removed,' is, as we have seen, the second step of Brown's process.

"After the defendant's concentration is finished, the by-product goes forward to be subsequently treated by a protracted process of cyaniding. This is at variance with Brown's process in three respects: First, cyaniding follows concentrating; second, it is a system condemned by Brown and one he sought to avoid, in that, where 'concentration * * * is used preliminary to the cyanide process, it will be necessary to have a very extensive system of settling tanks in order to recover these suspended values and hold them in the mill, so that they may be subjected to further treatment'; third, the defendant's process, which physically withdraws from the operation of the process the products of concentration in advance of withdrawing those of cyaniding, makes the process one avoided by Brown. * * *"

"It is apparent, therefore, that the defendant's device, which the proofs show has been of great practical worth, owes its worth to the fact that it is built and operated in express disregard of the instructions of Brown's patent. Without passing on * * * the validity of that patent, it suffices to hold defendants do not infringe." Tonopah Co. v. Vincent, 212 Fed. 163, 167, 168, 129 C. C. A. 19, 23, 24; U. S. Glass Co. v. Atlas Glass Co., 90 Fed. 724, 33 C. C. A. 254; Pittsburgh Co. v. Seaman-Sleeth Co., 248 Fed. 705, 160 C. C. A. 605; American Co. v. Elkhart (C. C.) 84 Fed. 960, 967.

As in the generality of chemical cases, the court must depend largely for information and guidance upon expert opinion and testimony. In the very nature of things, the average lawyer has found the pursuit of his own profession a task sufficiently engrossing to preclude the possibility of his acquiring any great proficiency along scientific lines, and it therefore follows that, when the abstruse involvements of chemical action constitute the issue, dependence must be had upon the opinions and deductions of those who have made a deep and prolonged study in these fields, and the court must then weigh the testimony of those who may differ radically as to the matters submitted to them, and draw its own conclusions.

In the present case I am free to say that, so far as evident frankness and sincerity are concerned, I was equally impressed by both experts, and I can only regret that the tests of each were not made under circumstances practically identical. Such was not the case, however, and an exact comparison of findings is therefore not possible.

While the burden of proving infringement is upon the plaintiff, it developed that the plaintiff's expert had never analyzed any of the defendant's product, and that his actual experiments with the liquor submitted to him by the plaintiff, made with a view to establishing the results obtained through defendant's process, were made under conditions in no wise identical with those obtaining in the manufacture of the defendant's product. In the first place, the history of the liquor submitted to him by the plaintiff was unknown to him, so far as previous exposure to air, subjection to varying temperatures, etc., was concerned. Instead of spraying the liquor in the open air to obtain oxidation, he sprayed it in a room. Instead of allowing the sprayed liquor to fall through eight feet of space, he sprayed it through four feet only. The nozzle used by him for spraying was not of the same make as was that employed at the York Haven plant. He heated his liquor to a temperature of about 200° F. before spraying, whereas the liquor at the York Haven plant reaches the sprayer at a temperature from 158° to 167° F.

After the spraying process, plaintiff's expert testified that the liquor dropped to 90° F., while in the York Haven process the liquor at this point is found to have dropped to 113° F. His testimony shows that the liquor tested by him was neutralized with lime, and warmed gently, and filtered and evaporated to 30° Baumé. The York Haven process first heats the liquor to 185° F., approximately, and then adds lime, not to the point of neutralization merely, but in excess thereof, for the obtaining of a material alkaline in character.

These various differences convince me that the plaintiffs' tests cannot be taken seriously, so far as they attempt to show infringement, because of the wide divergence of antecedent and collateral conditions having to do with the experiments, as compared with the conditions surrounding the York Haven process.

"There was conducted an experiment before trial, the results of which were given in evidence, and appellant submits them as proof of infringement. In other words, he claims the two structures are similar, because of similarity of results; that is, both generate $CO_1$ in constant and sufficient quantities. We are not impressed by the proof. Upon appellant was the burden of proving infringement. It could have conducted its experiment in a box car or in a similarly constructed and similarly ventilated structure. Instead, it took an air-tight box, 4x4x5, containing but 80 cubic feet of air. Oxygen content was reduced from 19.2 to 6.7 cubic feet before the experiment began. The period of time covered by the experiments was not the same. Appellant's structure was in the box one hour, while appellee's was used but 46 minutes. The $CO_1$ in the box when appellant's test began was .96 and increased to 1.61 per cent., and showed a steady increase. Meanwhile the oxygen was reduced. When the experiment with appellee's burner began, the $CO_1$ was 1.44 cubic feet, and rose in 23 minutes to 2.24, and during the second 23 minutes fell to 1.60, or nearly 50 per cent. During the same period, the $CO_2$ steadily increased, while in appellant's case it remained about even." Klauer v. Western Metal Specialty Co. (C. C. A.) 276 Fed. 93, 98.

" * * * The weight to be given the experiments in this case depended in part upon the impression created by the witnesses who testified in open court. To a certain extent, therefore, credibility entered into the finding." Klauer v. Western Metal Specialty Co. (C. C. A.) 276 Fed. 93.

The two experts differed also in their opinions as to the resultant products of the two processes. While the defendant's expert gave it as

his opinion that the difference in characteristics between the two was one of degree, the plaintiff's expert vouchsafed the opinion that the two are identical products.

[5] Because the plaintiffs' expert admittedly had not seen or experimented with the defendants' product, I am unable to accord any great weight to his opinion on this particular point. But if, for the sake of argument, the identity of the two products is admitted, that of itself would not establish infringement, unless there were practical identity of methods leading to such identical results. The difference in the two processes, heretofore mentioned, demonstrates to my satisfaction that there is no such similarity in the steps leading to the finished products as would, in conjunction with identity of result, establish infringement.

In Cimiotti Co. v. American Fur Co., 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100, the Supreme Court has said:

"If the device of the respondents shows a substantially different mode of operation, even though the result of the operation of the machine remains the same, infringement is avoided."

In Fitch v. Spang (C. C.) 140 Fed. 292 (W. D. Pa.), the court said:

"That mere identity in results is not the test of infringement is a proposition too plain for argument."

In Pittsburgh Iron v. Seaman-Sleeth Co., 248 Fed. 705, at page 713, 160 C. C. A. 605 (C. C. A. 3d), in finding noninfringement Judge Woolley said:

"The plaintiff has shown by its own witness that identity of the two metals cannot be established by proof even of identity of analysis; and it is very certain that similarity of performance does not establish identity of the metals. * * *"

In Akimoff v. Dynamic, 285 Fed. 480 (C. C. A. 3d), Judge Buffington, in reversing the lower court and finding noninfringement, said:

"Now, the purpose and the accomplishment of both the plaintiffs' and the defendants' machines is to locate in rolls and other revolvable bodies these two objectionable factors of dynamic and static unbalance, and the question here involved is whether plaintiffs and defendants secure that result by substantially the same means and methods, for the law is clear that mere identity of result is not the test of infringement, but substantial identity of means and methods."

See, also, Westinghouse v. Boyden, 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136; Cheatham v. Brooklyn, 238 Fed. 172, 151 C. C. A. 248 (C. C. A. 2); Conrader v. Judson, 238 Fed. 349, 151 C. C. A. 365 (C. C. A. 2).

There was offered certain testimony relative to the experimental use of compressed air at the plaintiff's plant as agitator of the liquor, and the defendant Robeson was closely questioned regarding his knowledge of the practice; the purpose being, apparently, to classify such use of compressed air as a practical equivalent for the oxidizing process practiced at the York Haven plant.

This feature carries no weight in either direction. The claim of the plaintiff is that its patents, not its practices, have been infringed, and if, for any reason, there has developed at plaintiff's plant a practice

not set forth in any part of its patents, either descriptions or claims, and which is a contributing factor in the make-up of plaintiffs' product, infringement of the patents cannot be claimed, even if such extraneous practice is copied in every detail. Consequently it makes no difference whatever whether the use of compressed air produces oxidation or not, since the patent in suit declares for the exclusion of oxidation, and oxidizing of any and all sorts may be practiced and employed with impunity, so far as any trespass upon plaintiff's rights is concerned.

"I have no doubt, from the evidence, that both the complainant and the defendant are employing substantially the same process in the actual treating of road surfaces; but the case does not turn upon the actual process which the parties are employing, but upon whether the process employed by the defendant is the same as that described in the patent to the complainant. And while, as I have said, I have no doubt that complainant and defendant are employing substantially the same process, I have equally no doubt that neither of them are employing the process described and limited in the patent claims." Ward v. Finley Method Co. (D. C.) 259 Fed. 869.

None of the patents here involved is a basic patent, and claims nothing more than improvement over that which was existent prior to its issue. That being the case, a claim for infringement cannot be sustained, even though the difference between the plaintiffs' and defendants' product is but one of degree.

"The law is well settled that where the patents sued on are not pioneer patents, and do not embody a primary invention, but are only improvements on the prior art, and defendant's machines can be differentiated, the charge of infringement cannot be maintained. Kokomo Fence Mach. Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689." Johnson v. Johnson (C. C.) 190 Fed. 25, 26.

It therefore appears to me, and is my opinion, for the reasons above set forth, that the defendants' process and product have not infringed the patent in suit No. 833,634.

[6] And with reference to the second patent in suit No. 1,069,029, for a process of treating roads, an inspection and perusal thereof, even apart from the testimony, reveals that it is nothing more nor less than the utilization of the product of patent No. 833,634, as applied to the treatment of "roads and road surface comprising clay or clay-yielding materials, to compact the same and retard and substantially prevent the formation of dust, which consists in coating or sprinkling such roads or road surfaces with a concentrated body of sulfite waste liquor."

The fact appears clearly in the following quotation from 1,069,029:

"In the patent granted to me October 15, 1906, No. 833,634, *a process* of treating such waste liquor for the purpose of recovering the greater portion of the colloidal matter as well as all of the contained resins, gums and other extracted constituents of the woody tissues, *and the product of such process* are fully described and claimed. The material which I employ as a means of surfacing or building roads *is said product*, a concentrated body made in accordance with a patented process from waste sulfite liquor." (Italics mine.)

As descriptive of said product, it may be noted that in the first, third, fourth, fifth, seventh, and eighth claims of patent 1,069,029 the body of sulfite waste liquor is set forth as being "chemically unde-

composed," which is, in effect, a reiteration of the phrase "chemically unchanged," as employed in claims 9 and 19, and the word "undecomposed," appearing in claims 12 and 13 of patent No. 833,634, and all of which consistently bears out the principle enunciated in the last of the differentiating tests set out in said last-named patent as follows:

"By the addition of a quantity of water equalling that removed by evaporation the original liquor may be reproduced, showing that its constituents have undergone no injurious change."

Nowhere is it claimed that the material used by defendants in road construction is different from the product of the York Haven process, and the York Haven product is not a "chemically unchanged" or "undecomposed" mass or body of sulfite waste liquor. Neither can the original liquor be reproduced in the York Haven process by the addition of a quantity of water equalling that removed by evaporation.

Having linked patent No. 1,069,029 tightly to patent No. 833,634, the claims of the later patent, so far as material is concerned, cannot be broader than those of the earlier one, and these, time after time, limit themselves to liquor "undecomposed" and "chemically unchanged."

The defendants' product being neither "undecomposed" nor "chemically unchanged," it necessarily follows that it is neither the product of patent No. 833,634 nor a duplicate thereof, and the use of it, therefore, by defendants, does not constitute infringement of patent No. 1,069,029.

For the foregoing reasons, I am of the opinion that the plaintiff has failed to prove infringement of either patent, and that its bill of complaint must therefore be dismissed.

⬦⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes